## THE TITAN.[1]

### THE FRANCIS.

### SANBERN *v.* THE TITAN AND CAR-FLOAT No. 6.

*(District Court, S. D. New York. December 18, 1890.)*

COLLISION—STEAM-VESSELS MEETING—TIDE-RIP—SWINGING—EAST RIVER NAVIGATION—SAFE MARGIN—WRONG SIDE OF RIVER—PROXIMATE CAUSE.

The tug T., moving slowly with two car-floats along-side, came around the Battery into the East river, near the New York shore. The steam-boat F. came down the East river with the ebb-tide, at a speed of about 12 knots, and shaped her course to pass the T. starboard to starboard, each giving a signal of two whistles. On the ebb, there is a tide-rip off the Battery, which tends to swing to starboard the head of a vessel entering the East river near the New York shore. This was known to the pilots of both vessels. The T. swung about two points to the starboard on striking the tide-rip, and collided with the F. The river was clear of vessels at the time. *Held,* that the F. was bound to have so shaped her course as to leave a safe margin for the known effects of the tide; that the course of the T. along the New York shore, contrary to statute, was not the proximate cause of the collision, and was immaterial, the F. having had ample time and space to keep out of the way; and that the F. alone was liable for the collision.

In Admiralty. Suit to recover damages caused by collision.
*Sidney Chubb*, for libelant.
*Goodrich, Deady & Goodrich*, for respondent.

BROWN, J. The array of witnesses against the libelant on every important point is too great to warrant a decree in his favor. The weight

---

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

of testimony is that the collision was from 300 to 500 feet off pier 3. The Titan was heavily incumbered with two car-floats along-side. She came out of the North river around the Battery, near the New York shore, in order to avoid the strong ebb-tide, and continued near that shore until she struck the ebb, probably shortly before the collision. The Francis had come down the East river at the rate of about 12 knots, including the tide, and passed under the bridge within one-third of the distance across from the Brooklyn shore. The place of collision was less than a third of the channel-way across from the New York piers to Diamond reef. The statute required the Francis to keep in mid-river, as near as may be, and nothing prevented her doing so, as the river was unusually clear of other vessels. When her master and pilot first noticed the Titan, each vessel was on the starboard hand of the other, though probably very slightly. The Titan, as the libelant's officers say, was then headed a little towards the New York shore, and so her own witnesses state. Her position and course were evident to the Francis, and she was proceeding very slowly, and there was abundant room for the Francis to keep out of the way by going to the left, by a large and safe margin, and passing starboard to starboard. Two whistles were exchanged between the vessels, indicating their intention to pass in that way. The libelant's witnesses claim that they would have passed safely had not the Titan sheered to starboard on striking the ebb-tide; but they state that this sheer did not commence until about 15 seconds before the second signal of two whistles, and that the Francis ran only about 200 or 300 feet after that last signal. From this it is evident that the swing of the Titan began less than half a minute before collision, and that any change in her position arising from her swing must have been comparatively small, as she was going very slowly. Her own witnesses, including some disinterested witnesses, who were watching her, did not observe any such swing; and the whole amount of her swing, as indicated by the diagram of the angle of collision, allowing one point for the swing of the Francis to port, as her witnesses state, was only two points. The liability to such a moderate change of heading in meeting the ebb-tide is well known to those navigating the harbor, and must be counted on and allowed for in passing. A change of two points within less than half a minute, and going so slowly as the Titan was going, could not have changed her position in the river over 50 feet. The Francis in passing to the left was bound to allow much more than that. The statute required 20 yards even in ordinary circumstances, and here the liability of the Francis to swing to port was known.

I am quite satisfied that the collision happened because the Francis, at the first signal which her witnesses mention, in shaping her course to go to the left, did not allow a sufficient margin for safety. She starboarded, but not hard. She headed to the left, very likely enough, if her heading could have been made good; but she could not make her heading, because the strong ebb carried her down so rapidly; in other words, she did not make sufficient allowance for the effect of the tide on

either vessel. There was abundant time and space for the Francis to have kept away in mid-river after the position and course of the Titan were seen and understood. The position of the Titan near the New York shore, instead of in the middle of the river, presented no difficulty or embarrassment to the Francis, and was therefore not a proximate cause of the collision. *Cayzer* v. *Carron Co.*, L. R. 9 App. Cas. 873; *The City of Springfield*, 29 Fed. Rep. 923; *The Britannia*, 34 Fed. Rep. 558.

The testimony of many of the defendants' witnesses, a number of them disinterested, makes it difficult to resist the conclusion that the Francis did cross the river somewhat rapidly after passing under the Brooklyn bridge, so as to get pretty near the New York shore when in the vicinity of Wall-Street ferry. This explains the testimony of the Titan's pilot, and his uncertainty as to the intended course of the Francis.

I am not satisfied that there was any material porting of his wheel, or any such change in his position through the swing in the tide, as to excuse the Francis for not passing by a safe margin to starboard, in accordance with the signals exchanged.

I do not perceive any fault contributing to the collision in the management of the Francis, under the circumstances, and must therefore direct a decree dismissing the libel.