# THE VICTORY.

## THE PLYMOTHIAN.

### ELCOATE v. THE PLYMOTHIAN.

### OWNERS OF THE PLYMOTHIAN'S CARGO v. THE VICTORY and THE PLYMOTHIAN.

(District Court, E. D. Virginia. September 18, 1894.)

1. COLLISION—RULES AS TO PASSING—COAST WATERS.
    Tide waters, navigable from the ocean, by ocean craft, are "coast waters," within Act March 3, 1885 (23 Stat. 438 et. seq.), adopting the revised international rules and regulations for preventing collisions at sea (article 21 of which embodies the rule "Keep to the right"), and declaring that they shall be the rules for navigation on the high seas and in all coast waters, except as are otherwise provided for; the exception being defined by the further provision that "nothing in these rules shall interfere with the operation of a special rule duly made by local authority, relative to the navigation of any harbor, river, or inland navigation."

**2. SAME—RIVERS—HARBOR RULES.**

Part of a river not within the territorial limits of a city, though part of its harbor is not affected by a rule of navigation for the harbor ordained by the city, under provision of Act March 3, 1885, that a special rule, duly made by local authority, relative to the navigation of any harbor, shall not be interfered with by the international rules of navigation.

**3. SAME—KEEPING TO THE RIGHT.**

When the steamers P. and V., the former going 4 miles and the latter 6 miles an hour, were at a distance of 1⅛ miles, approaching each other. in clear daylight, along a narrow channel, which was in full sight, and governed by international rule 21 ("Keep to the right"), the P., which was obeying the rule, signaled the V., which was not obeying it, that they should pass port to port. When over 1,000 yards distant, the V. answered with a cross signal, that they should pass starboard to starboard, without there being any cause therefor, and without giving any signal to indicate that there was such cause. The P. thereupon repeated its signal, which the V. promptly answered with its cross signal, whereupon both gave alarm signals and backed, without, however, preventing a collision. *Held*, that the V. was liable therefor, and the fact that, shortly before the collision, she had a schooner under her starboard side, and that this and two other schooners, which she had met shortly before, passed on her starboard, was no excuse.

**4. SAME—ABSENCE OF LOOKOUT IN BOWS.**

The fact that a steamer had no lookout forward at the time of a collision will not render her liable for the cargo, as having contributed to the collision, she being navigated at the time by a pilot, with her master on the main bridge acting as lookout, and she having omitted nothing which she ought to have done, or which she would have done had there been a lookout in her bows.

In Admiralty. Libels by S. Elcoate, master of the steamship Victory, against the steamship Plymothian, and by the owners of the Plymothian's cargo against both steamers, and petitions by the owners of both vessels for limitation of liability.

On the 12th day of November, 1891, the steamers Victory and Plymothian came in collision in the Elizabeth river, between Lambert's Point and Craney Island light. It was in broad daylight, at 4:14 p. m. of a clear day. At the time of collision, the Victory was bound in ballast from Hampton Roads to Norfolk. The Plymothian was bound to sea, having left Galveston November 1st, with a cargo of cotton, bound to Liverpool, and having, in the prosecution of that voyage, come in through Hampton Roads, and taken coals at Lambert's Point, Norfolk. By the collision, the port side of the Plymothian was cut below the water's edge near amidships, and, to save her from sinking, she was run ashore. Some of her compartments filled with water, and her cargo was much damaged. Several suits were brought by persons sustaining damage, and thereupon the owners of each steamer instituted proceedings for limitation of liability. The value of the Victory has been appraised at $67,500, and her owners have given stipulation for that amount. The value of the Plymothian has been appraised at $33,350, and the value of her freight at $11,871, making a total of $45,221, which is to be reduced, however, by the steamer's proportion of the expenses incurred for salvage services to her and her cargo. The amount of her owner's liability will therefore be about $40,000. In response to citations issuing in these proceedings, the damages arising out of said collision have been assessed. Those sustained by the owners of the Victory have been assessed at about $14,500; those sustained by the owners of the Plymothian have been assessed at about $42,000; and the damages sustained by the owners of the Plymothian's cargo have been assessed at about $72,000.

In stating what I conceive to be the facts of this case, derived from a huge mass of conflicting testimony, I shall be in frequent conflict with evi-

dence given on one side or the other in the case. Owing to the unusual volume of this evidence, it will be impracticable for me to analyze the statements of witnesses as to each fact, and to show why any fact which I have stated has been adopted. The task would be great, and its execution tedious, and it has been rendered unnecessary by the unusually elaborate and able discussions of the evidence which have been submitted by counsel on either side in their briefs.

The Victory (Elcoate, master) was an iron ship, of 1,774 net tonnage, 338 feet in length, 38½ in breadth, with 17 feet aft and 13 feet forward of draft. She had on 400 tons of water ballast, and 550 tons of coal. Her number of officers and crew was 31. The Plymothian (Mardon, master) was 260 feet long, 1,016 tonnage. net, had a crew all told of 21 men, and had a cargo of 3,682 bales of cotton. She responded with exceptional facility and promptness to her helm. The two vessels were actually navigated by their respective pilots. Nelson on the Victory, and Henley on the Plymothian. The masters of the two vessels were each on the bridge with the pilot, each acting as lookout, and seeing that the orders of the respective pilots were executed. Neither ship had a special lookout forward of the bridge in her bows. Several members of each crew were examined as witnesses in the case. All were respectively offered and ready to be examined. The collision occurred close upon what is now black buoy 7, which marked the eastern side of the 18-foot channel between Craney Island light and Lambert's Point light, in Elizabeth river. The course of the channel up the river from Craney Island light to black buoy 9 is nearly south; and the channel at buoy 9 turns southeastward towards Norfolk, at an angle of about 65°; but the course coming out from the coal pier at Lambert's Point into the channel, around buoy 9, turns an angle of about 45°. According to a chart of this channel (Exhibit X), filed by counsel for the Victory, the distance from Craney Island light to buoy 7 is 1,200 yards, or about two-thirds of a mile, and to buoy 9 is 1,967 yards, or 1⅛ miles; the distance between the two buoys being 735 yards, or three-eighths of a mile. The channel here is easily navigable for ships drawing 25 feet of water. Its breadth at Craney Island is 250 yards; and at buoy 9, a mile and an eighth south, is 400 yards, broadening as it extends. Below Craney Island light, as the river Elizabeth flows, the channel stretches three miles and a half, in a straight course, due north, into Hampton Roads, opposite Sewall's Point. There is no obstruction to the view over the entire length of the channel between Sewall's and Lambert's Points, except by such vessels as may happen to be lying near or passing along the channel. On the western side of the channel, south of Craney Island, as far as buoy 9, very spacious waters expand to the shore, which are navigable for a distance of twice the width of the channel for vessels of eight or nine feet draft. East of buoy 9 there is a wide space of water extending half a mile to land, but it has no navigable depth. It is deceptive, however; and, owing to the eastward bend of the channel around buoy 9 to Lambert's pier, navigators coming up from Craney Island are apt to head directly for Lambert's Point light, thinking they are in mid-channel, when, in fact, they are more or less east of mid-channel, and are unintentionally violating a cardinal rule of navigation, which enjoins them to keep on the spacious waters west of mid-channel. It was in the channel and waters thus described that the collision which has been mentioned occurred. Each ship had on board, as required by law, a licensed pilot, taken up at the Virginia Capes. The Victory was coming in to Norfolk in ballast. The Plymothian, having come in for coal, was going out on her voyage to Liverpool. Just as the Plymothian, having left Lambert's pier, had rounded buoy 9, and had straightened out on her course down the channel, the Victory, in coming up from Hampton Roads, had got just abreast of Craney Island light. It was at about 4 p. m. that the two ships were thus in motion, and began to approach each other at a distance apart at the start of a mile and an eighth. The Victory had been moving at the rate of ten miles an hour; but at Craney Island she slackened her speed and proceeded up the channel at the rate of six or seven miles an hour, with a two-mile flood tide assisting her. The Plymothian, on straightening out

at buoy 9, had begun to move against the tide at the rate of about four miles an hour. The Plymothian moved on a ported helm, and kept well to the eastern side of the channel. The Victory, which, at Craney Island light, was at mid-channel according to most of the evidence, but on the eastern side according to her own testimony, moved, after or from the time of passing Craney Island light, on or to the eastern side of the channel, under a starboard helm. Each vessel moved so long on these courses under the helms respectively mentioned that when the collision which was threatened became imminent, and each reversed engines and backed with all speed, they did so ineffectually. The Plymothian's headway was checked, but she had little backward movement, if any, at the time of collision. The Victory's headway was not stayed, and she was still moving forward at the moment of collision. The stem of the Victory, at about 4:14 p. m., came into the port side of the Plymothian at her main bridge, inflicting so deep a wound that she was immediately beached on the bank of the channel east of buoy 7. Shortly before sounding three whistles and reversing her engines, the Victory had a schooner close under her starboard side, which prevented her from porting her helm. She had previously met two other schooners on her starboard side. All three of these schooners were on the east of mid-channel, bound out to Hampton Roads.

It would seem to be useless to consider how either vessel had moved before the time when, one of them being at Craney Island light, and the other off buoy 9, they began, at the hour of 4 p. m., to approach each other in the open channel. But it may as well be premised that the Plymothian had not before then, in coming out from Lambert's pier, gone over to the west of the channel near to red buoy 22; and had not, after doing so, recrossed the channel to reach its position near buoy 9, as claimed by the Victory's counsel. The tide was not strong enough to force her over there, and it would have been out of her course to have gone there. The testimony is conclusive to that effect. Nor was the west side of the channel, as seen on that afternoon from Craney Island light, to red buoy 22, lined with numerous vessels at anchor to a degree obstructing that side of the channel, as claimed by the same counsel. There were barges and other craft anchored near the red buoy, but not as many as usual. The weight of testimony is that the western part of the channel, as far at least as abreast of buoy 7, was free from obstruction. The Victory's own witnesses place such schooners as that steamer met after passing Craney Island east of mid-channel, in positions not only suggesting to her to take the western side, but forbidding her, under the rule, to take the eastern side. Moreover, the claim of the Victory's crew that each of three steamers which she met in coming from Hampton Roads up Elizabeth river gave her two whistles, and forced her over to the eastern side of the channel, is contradicted flatly by the officers of two of those steamers, and by all the witnesses in the case who testified that, when she had reached Craney Island, she was in mid-channel. The preponderance of testimony in favor of her being in this last-named position is so great as to be conclusive of the fact. The only steamer whose crew was not examined on this point was a foreign tramp; and her testimony could not be obtained. But that vessel was met in Hampton Roads three miles from where the next steamer was met, and there was space and time abundant for the Victory to pass to the proper side of the channel after meeting the tramp. Even if the two other steamers had passed on her starboard side, which they deny that they did, their distance apart was ample for allowing the Victory to pass between them to the western side of the channel, if she had desired to do so. Nor, indeed, did the Victory (if, in fact, she had been pressed by the three steamers to the eastern side of the channel, and was held there when she reached Craney Island by a sort of marine duress), at any time after sighting the Plymothian, give her alarm signals, or any sort of notice that she was on the east side of the channel by a compulsion which she could not throw off. I consider it proved beyond reasonable doubt that the Victory and Plymothian, at 4 p. m. on the afternoon under consideration,—one of them in mid-channel abreast of Craney Island light, and the other in mid-channel abreast of

buoy 9,—were free to proceed according to the rules of navigation governing them on the occasion, on their respective courses, without obstruction or let or hindrance of any kind.

Much evidence was taken pro and con on each side upon the question of the seaworthiness of the whistles of the two steamers. The result of the elaborate testimony taken on this question is to show that the whistles of both steamers were as good as those of English steamers usually are, and were in good working order. After rounding buoy 9, and straightening out on her course down the channel, the Plymothian gave a long whistle, indicating that she would pass the Victory port to port. It was some time before the Victory answered, which she at length did with a cross signal of two whistles. Nelson, her pilot, says, supported by a heavy preponderance of testimony, that she did not respond until she was halfway between Craney Island light and buoy 7. The Plymothian thereupon blew one signal whistle a second time, and was then promptly answered by a cross signal of two whistles by the Victory. The two steamers thereupon, and at the same time, blew alarm signals, and at once backed their engines at full speed; and this backing of engines continued until the collision occurred. The headway of the Plymothian was overcome, and it is possible she attained a slight backward movement. The headway of the Victory was not overcome, and she ran into the Plymothian's broadside, with such force as to drive 15 inches into her side, and to render immediate beaching necessary. She penetrated 15 inches into the Plymothian, notwithstanding the fact that the angle of incidence with that ship was 60 or 70 degrees.

Sharp & Hughes, for the Victory.

Whitehurst & Hughes, for the Plymothian.

Butler, Stillman & Hubbard, by Mr. Mynders, for the Plymothian's cargo.

HUGHES, District Judge (after stating the facts). It is obvious from the foregoing statement that the question in the case under consideration is whether or not it is governed by the great rule of the road, "Keep to the right." That rule is embodied as article 21 in the "Revised International Rules and Regulations for Preventing Collisions at Sea," adopted and made the law of the United States by the act of congress of March 3, 1885 (23 Stat. 438 et seq.). The act declares that they shall constitute the rules for the navigation of vessels "upon the high seas and in all coast waters of the United States, except such as are otherwise provided for." The exceptions alluded to are defined by the act itself, in the section declaring that "nothing in these rules shall interfere with the operation of a special rule, duly made by local authority, relative to the navigation of any harbor, river, or inland navigation." The rule only is excepted, not the coast water itself. The act of congress prescribing these rules is a law, of which all the world must take cognizance. Special rules of local ordination are not laws. but rules only, and, in order to be binding, must be brought home to the knowledge of navigators, and proved affirmatively in the courts. I know, however, of no provision of such local rules, so far as they affect our eastern waters navigable from the ocean, which conflicts with the international rules adopted by congress, and prevailing, by general adoption, the world over. These general rules of the world at large, adopted and made laws of the United States by congress, are in force in the oceans and seas off

our coasts, and in all the coast waters of the country; that is to say, in the rivers, bays, and roadsteads opening into the ocean, and "allied to ocean navigation, from being used and necessarily used by all ocean-bound vessels" and vessels coming in from the outer waters. These rules would be paralyzed if they ceased to operate in favor of ocean ships as soon as they passed within lines drawn between points of land projecting into the ocean. That they are intended to be in force and operation within such lines is proved by their very terms. Article 21, which has been mentioned, would be a meaningless nullity under a contrary contention. Its language is: "In narrow channels every steamer shall, when it is safe and practicable, keep to that side of the fairway, or mid channel, which lies on the starboard of such ship." Except in the instances of two or three great straits, in different parts of the world, —so few in number and each so wide that no rule is necessary in regard to them,—no such narrow channels as article 21 contemplates are to be found beyond lines drawn between the great fauces terrae of our seaboard. The contention that this important article applies only to the outer seas would exclude Chesapeake bay, Hampton Roads, and Elizabeth river from the category of "coast waters." That bay has been called the "Mediterranean of America," from the vast and varied commerce that floats upon it, carried largely in ships of the ocean. Hampton Roads, from the depth of its waters, its spacious area, and its land-locked conditions of safety, is a favorite resort in storms for all vessels that navigate our Atlantic seaboard. Elizabeth river carries a channel of 25 feet in depth, and from 250 to 500 yards in width, all the way from Hampton Roads to the national navy yard at Gosport. It would be imposing hard lines upon foreign steamers and sailing ships coming up to Norfolk, with and for heavy cargoes, for the courts to repeal article 21 as to a river traversed so constantly by sea-going ships of the largest size and capacity as the Elizabeth river is,— an article known to all navigators from every part of the earth,— and to dwarf the river into a local harbor, subject to the provincial domination of a town council, and to the crude regulations of ever changing town officials. It may not be practicable to define with precision the meaning of the phrase "ocean waters;" but, so far as this court is concerned, I hold that it embraces all waters opening directly or indirectly into the ocean, and navigable by ships, foreign or domestic, coming in from the ocean, of draft as great as is drawn by the larger ships which traverse the open seas. I hold that all tide waters, navigable from the ocean, with navigable depth for ocean craft, are "coast waters," in the meaning of article 21. The Elizabeth river, between Norfolk and Hampton Roads, is one of the ocean waters, and the international rules of navigation are therefore in full force and operation in that river.

Elizabeth river is not embraced within the meaning of the clause of the act of congress providing that "a special rule duly made by local authority relative to the navigation of any harbor" shall not be interfered with by the international rules of naviga-

tion. If the river is a harbor at all, it is only as a part of the harbor of Norfolk. But it is not within the territorial limits of Norfolk, and is not subject to any municipal regulation in force within that corporation. It is competent for Norfolk to ordain rules of navigation for her own harbor; but these rules lose their authority when the territorial boundaries of the city, either on land or water, are passed. But, even if this were not so, it has not been shown that any rule of navigation ordained by Norfolk for the government of shipping within her own harbor is in conflict with article 21, or with any other law of navigation embodied in the international rules. If so, if there be no municipal rule of navigation in force in Norfolk harbor with which article 21 or any other international rule interferes, then Norfolk harbor is itself subject to those international rules, and is in the category of "coast waters" contemplated by the maritime act of congress of March 3, 1885. Those rules are in force in Elizabeth river, independently of any rules ordained by Norfolk; and they are in force in Norfolk harbor itself, as long as they shall not interfere with any rule of navigation which may be enacted by the local municipality. It is fortunate for Norfolk that this is so; it would be a subject of serious public regret if it were not so.

International article 21 was the law of the road on the occasion when the Plymothian, off buoy 9, and the Victory, abreast of Craney Island light, one mile and an eighth apart, began at the same time to approach each other along the narrow channel of Elizabeth river, between those two points. The Plymothian obeyed article 21; the Victory disregarded it. The collision, which happened in direct consequence of the Victory's disloyalty to the rule, was caused by the Victory, and through her fault alone. The fact that she had had a schooner close under her starboard side shortly before the collision did not excuse, but condemned, her. The fact that this and two other schooners were moving on her starboard on the eastern side of the channel were three additional reasons why she should have come up on the western side from Craney Island. These three insignificant vessels were teaching her a lesson, which she rejected. International article 15 did not apply in this case. At a distance of a mile apart, these two steamers, in full sight of the channel between them, by clear daylight, were not approaching each other "in such a manner as to involve risk of collision." The liability of the Victory for this collision does not depend upon the question whether the statement of facts drawn up by the court, and prefixed to this opinion, is strictly and in every respect in conformity with the weight of evidence taken in this cause. If there were no other evidence in the record but that given by the master and crew of the Victory, that ship would be shown to be liable. She had no right, seeing the Plymothian coming up the narrow channel, to persist in running on the eastern side of it. The thoroughly disproved testimony given by her master and the deck witnesses of her crew, intended to show that she was driven to the extreme eastern side of the

channel by other steamers and by sailing vessels, has no other value in the case than to show that these witnesses felt the pinch of article 21, and made desperate efforts to excuse the obstinate and fatuous perseverance of her navigators in keeping on the eastern, and to them, as they well knew, the contraband, side of the channel. The Victory is liable for the collision; and I will decree in all respects to that effect.

It remains for me to deal with a few of the special aspects of the case. On the question of lookouts, I have been always exacting, and I think both steamers were at fault in not having had each a special lookout on duty; but in neither case does it appear that the absence of such a lookout contributed to this collision. Each ship was navigated by a licensed pilot, with her master at his side on the main bridge acting as lookout. It was in the daytime, and the way was as visible to the officers on the bridge as it could have been to a lookout at the stem. The master and pilot were in each case intent upon the duty in hand, and their orders to the helmsman and to the engine room would hardly have differed from those actually given if a lookout had been calling out to them what they both clearly saw and knew. But it is only with reference to the Pymothian that the question of lookout is of any importance. The contention of counsel for the cargo that the absence of a lookout on that steamer contributed to the collision is not supported by the evidence in the case. Inasmuch as this evidence shows that the officers on the bridge did not hear the first cross signals of the Victory, this counsel contends that if there had been a lookout forward, and the pilot Henley and the master Mardon had been notified of this cross signal, there would have been time for the Plymothian, by hard starboarding, to have passed the Victory on her starboard side. But the proof is that the Victory blew her first cross signal of two whistles as far off as halfway between buoy 7 and Craney Island light, or more than 1,000 yards from the Plymothian, before any stress of circumstances arose to require of her a violation of the rule of navigation which she was faithfully adhering to. It was not competent for the Victory, at that distance, to require from the Plymothian a violation of article 21, unless there was some cause forcing her to do so. That there was no such cause is shown by the evidence, and was virtually confessed by the Victory herself when she failed to follow up her cross signal by additional three sharp alarm whistles, giving notice of such a cause. Failing in this, the Pymothian was not, at a distance of 1,000 yards, and running against a flood tide at the rate of only 4 miles, either under obligation or at liberty to disregard a cardinal rule of navigation at the mere cross signal of the Victory. She would not and should not have done so even if a lookout properly posted in her bows had notified her navigators of the cross signal. Her officers on the bridge would and should have pursued precisely the course if they had known of the first cross signal which they did pursue on not hearing it; and the absence of a lookout contributed naught towards the collision. I therefore consider that

the contention of the counsel for the cargo on this point must be overruled.

Although it is wholly unnecessary in this decision to do so, I will notice some references of counsel for the Victory to the decision of this court in the case of The Laurence (rendered in August, 1892), and affirmed on appeal by the United States circuit court of appeals for the fourth circuit, at its February term, 1893. 54 Fed. 542. Counsel for the Victory contends that in that case this court held that a steamer coming up in the channel of Elizabeth river from Craney Island to Norfolk was at liberty to take either the western or eastern side of the channel at pleasure. The decision was a very different one, and was rendered in a case having no relation to the question involved in the present litigation. In that case the steamer New York, plying twice a day between Norfolk and Cape Charles City, had, in a foggy morning, while moving at an unlawful speed in a fog, run into the barge Lawrence, which was a very large vessel, loaded with coal, and lying at anchor on the western side of the channel of Elizabeth river, halfway between buoy 7 and Craney Island light. It was shown in evidence that the channel where the Lawrence lay was 450 yards wide; that the Lawrence was anchored on its western side as near to the bank as could be to allow of her swinging clear of it; and that at least half of the 225 feet west of mid-channel was clear. The Lawrence was swinging, when run into, due north on an ebb tide, and was not only on the western side of mid-channel, but was well off on the western side of that 225 yards of western channel. The steamer New York came up from Craney Island close upon the western side of the channel, in a thick fog, and struck the Lawrence on her starboard quarter, although there was abundant room between the Lawrence and mid-channel for the New York to pass to the port or east side of her. Nothing is said in the opinion of the court to indicate that the New York, in passing on the port side of the Lawrence, would have passed to the east of mid-channel. Between the Lawrence and mid-channel there was clear space of more than 100 yards, and the water east of mid-channel was not in the case at all. The evidence showed that there was not room between the Lawrence and the western bank of the channel for the New York to pass; and the court held that the New York was in fault in not passing on the eastern side of the barge, where there was abundant room. The court used the following language in its decision:

"All the testimony shows, and the pleadings admit, that they [meaning the Lawrence and a companion barge that was lashed to her port side] were then on the western side of the channel. The evidence shows, moreover, that the New York struck, from the west, the barge which was the western one of the two. Certainly, there was room in a channel, half of it as wide as 225 yards, for a steamer to pass vessels lying in the other half of the channel, which was another 225 yards in width."

That case has therefore no analogy with the one at bar.

Equally erroneous is the contention of counsel for the Victory that in that same case of The Lawrence–New York this court held

that the Elizabeth river, north of buoy 9, was a part of the harbor of Norfolk, and subject to her jurisdiction in respect to a harbor master. The facts were that by a stretch of authority, growing out of a public necessity, Norfolk had appointed a nominal harbor master at Lambert's Point, who assumed and exercised the authority of designating places of anchorage for the great number of vessels constantly coming in there for the Pocahontas coal. This "harbor master," so called, had for some time been in the habit of anchoring these vessels on the western side of the channel near to red buoy 22, and up and down on that side as far as necessity required. He so acted by general sufferance and from public necessity, and not by conceded authority. This quasi official action of his was known to all the masters of steamers which navigated that channel, all of whom acquiesced in and none of whom resisted his authority. Contrary to this self-adopted rule of acquiescence, the master of the New York, in the suit of The Lawrence, among other things, contended that the Lawrence, when she was struck by the New York, was unlawfully where she was, and that she had been illegally anchored there by a person who was not a harbor master, in the eye of the law. This court held that she had a right to be where she was when she was struck by the New York. Its language was as follows:

"In a technical point of view, the authority exercised [by the acting harbor master] is probably questionable. But the public interests required that there should be some authority to control and regulate the anchoring of those loaded vessels; and, until the law provides some other means of regulating this important business, custom and general acquiescence must be held competent temporarily to supply the omission of the law. These barges were passive in the matter of being placed in the anchorage in which they lay. They had not gone there of their own volition, in a spirit of caprice and indifference to consequences. The presumption is that, objectionable as the practice is of placing vessels along that channel in such numbers as the evidence shows, yet the placing of these particular barges was as judicious as the evil practice admitted of; and I do not feel that it would be competent or just for this court to undertake a reform of this evil by imposing penalties. The reform needed is a subject for municipal legislation; and it is hardly admissible for the court to assume the role of legislation by means of penal decrees and judgments."

There is nothing in this decision that gives countenance to the proposition that the channel of Elizabeth river, between Lambert's Point and Craney Island, is part of the harbor of Norfolk, subject to her jurisdiction, and excepted from the operation of article 21 of the international rules of navigation.

As to the question whether the clause contained in the bills of lading of many British ships, and sanctioned by British law, exempting the ship from liability for damages to her cargo, even when occasioned by the negligence, default, or error in judgment of the pilot, master, mariner, or other servants of the shipowner, and some of them containing a clause providing that the contract shall be governed by the laws of the flag of the vessel carrying the goods, it has been settled in this country that such clauses are contrary to public policy, and therefore null. I should feel constrained to rule accordingly if the question could arise in the case at bar.