### THE LOWELL M. PALMER.

#### THE WRESTLER.

(Circuit Court of Appeals, Second Circuit. October 11, 1905.)

Nos. 203, 204.

1. COLLISION—TUGS MEETING IN EAST RIVER—FAILURE TO CARRY OUT PASSING AGREEMENT.

The tug Wrestler, with a car float 240 feet long on her port side, extending 100 feet beyond her bow, left her slip on the Manhattan side of East river, and proceeded up the river. When about the center of the stream, which is there 1,400 feet wide, and headed toward the Brooklyn shore she received a passing signal of two whistles from the tug Palmer, which was coming down on the Brooklyn side with two car floats. The Wrestler assented to the signal but continued toward the Brooklyn shore at full speed until within 60 feet of the Palmer, when she reversed, but her float struck the bow of the Palmer's port float; the place of collision being only about 100 feet off the Brooklyn shore. The tide was flood, and it was claimed on behalf of the Wrestler that toward the Brooklyn side there was an eddy which prevented her bow from swinging while the tide carried her stern up stream, but it did not appear that she could not, with proper handling, have completed her turn before reaching such eddy. *Held*, that she was in fault for the collision; also, that the Palmer was not in fault for failing to sooner reverse, since she was not bound to anticipate the failure of the Wrestler to carry out her agreement, and it also appearing that at the time of collision she was making sternway.

2. Same—Contributory Fault—Vessel on Wrong Side of River.

 A vessel passing down East River near the Brooklyn shore, in viola-tion of the state statute, which required her to keep as near the middle as possible, is not for that reason chargeable with fault for a collision with a meeting vessel which assented to her signal to pass starboard and starboard, and where the vessels would have passed in safety but for the gross fault of the latter, and especially where the collision occurred a short distance above the bridge and the down-bound vessel was on the Brooklyn side in accordance with a well-recognized custom to enable her to pass the bridge in safety on a flood tide.

Appeals from the District Court of the United States for the Southern District of New York.

Appeals by steamtug Wrestler from decrees on cross-libels in collision adjudging the Wrestler solely in fault.

Clarence Smith, for appellants.

James J. Macklin, for appellees.

Before WALLACE, TOWNSEND, and COXE, Circuit Judges.

TOWNSEND, Circuit Judge. Between 10 and 11 o'clock on the night of April 18, 1905, the tug Wrestler, 115 feet long, with a car float, about 240 feet long, made fast on her port side and projecting 100 feet over her bow, started in a northerly direction from James Slip on the New York side of East river, bound up the river. At about the same time the ferryboat Union started out from her Main Street Slip, Brooklyn, with her wheel hard astarboard, bound for Catherine street, New York, and the tug Palmer, bound down the river, was opposite Adams street and near the Brooklyn shore, having crossed from the New York side towards the Brooklyn shore just below the Navy Yard. The Palmer was 100 feet long, and had two car floats in tow, one on each side, extending beyond her bow about 90 feet. The night was clear, and the tide was flood. The Union blew one whistle to the Wrestler, and the two vessels passed each other, port to port, at about the middle of the river. Apparently the effect of this maneuver was to cause the Wrestler to proceed further over toward the Brooklyn shore than she would otherwise have gone. During this time the Palmer had reached a point opposite Gold street, Brooklyn, and some 300 feet from the shore, and had blown two whistles, which were answered by two whistles from the Wrestler, which was then near the center of the river. Each boat then starboarded her helm. The Wrestler, at first, held her speed and continued to point toward the Brooklyn shore, and later swung up the river, and when the danger of collision was apparent stopped and reversed. The Palmer, after running a short time at full speed, slowed down, stopped, blew alarm whistles, and reversed. The port corner of the Wrestler's float struck the port corner of the Palmer's port float when the boats were about 100 feet off the Brooklyn shore. No opinion was filed by the judge who heard the cause, but all the testimony was taken in open court.

The faults charged against the Wrestler are that she had an incompetent master and crew, and that they were grossly negligent, after having accepted the Palmer's signal, in continuing on across the

river, instead of turning up so as to go to port and pass to the starboard of the Palmer. The Wrestler's defense of this course is that the eddy off the Brooklyn shore at the point where the Wrestler first starboarded her wheel, caused by the flood tide setting against the New York shore, held back her head as she tried to swing up stream, while the flood at her stern impeded her turning, and that it was therefore necessary for her to hold her speed in order to keep steerage way and overcome the effect of the tide. This defense is supported by the contention that the Palmer was in fault after having instituted this maneuver in running ahead without slacking her speed until she was within 60 feet of the Wrestler, instead of reversing and backing. The Wrestler claims that the Palmer might have backed and still kept her course down river, while allowing the Wrestler to go ahead under a starboard helm at full speed, and that it was necessary for the Wrestler to do so in order to keep her from heading toward the Brooklyn shore.

The evidence on this point may be summarized as follows: There is no material conflict in the testimony as to the movements of the two boats. While the witnesses for the Palmer assert that the flood tide would assist a vessel in straightening up and going up river, they admit that, if it strikes the eddy or slack water off the Brooklyn shore, it would have a tendency to swing the stern up and the bow down, and Osterhout, mate of the Palmer, further testifies as follows:

"Q. Don't you think the condition of the tide and slack water where the Wrestler was had anything to do with the swinging of the Wrestler? As the Wrestler actually approached the Palmer before the collision, don't you think the condition of the tide and slack water where the Wrestler was had anything to do with the swinging of the Wrestler? A. As he came nearer to us, it did. Q. Before you actually struck it had some effect? A. Before we actually struck; yes, sir. Q. What effect did it have? A. It naturally let his stern fall up river and bow in towards the Brooklyn shore."

It seems probable that the Wrestler had been forced over somewhat toward the Brooklyn shore by the Union, and that at the time of the collision she was in the eddy or slack water, and that for this reason she did not mind her helm and swing up stream as her master expected she would, but did, in fact, continue to head over toward the Brooklyn shore, contrary to the expectation and intention of the master of the Wrestler. He testifies as follows:

"Q. Did your vessel swing under the starboard wheel? A. She swung around some. Q. Did she swing as rapidly as she would ordinarily? A. No, sir. Q. Why not? A. I don't know, unless it was she was too far over to the Brooklyn shore in slack water, and with her stern out in the tide to balance things. * * * Q. How close had you got to the Brooklyn shore when you first got a glimpse of the Palmer? A. Probably a length or more away from the Brooklyn shore. Q. When you first saw her; that would be about 240 feet? A. Well, it was between 240 and 250 feet. Q. And you were headed then for what point in Brooklyn? A. Clear of the Adams Street Coal Dock. Q. You were heading then for the same point that you had been heading for when she was reported? A. A little ways above it. Q. How much above it? A. I couldn't say how much; the tide was carrying me right up sideways. Q. Were you also swinging under your starboard wheel? A. She didn't seem to swing. Q. You couldn't account for it? A. No, sir; the only way was that her head was in slack water, and

the tide was carrying her stern up as fast as I was trying to push her bow around. Q. You were alarmed and surprised, and could not account for it at that time? A. Yes, sir. Q. Did you find her a difficult boat to steer, the Wrestler? A. Not light. Q. But with this car float wasn't she a difficult boat to steer? A. Yes, sir."

It further appeared that the master was taking the Wrestler out that night for the first time; that he could not see over the cases from the pilot house; that it was his first night with Crowley, the man who was stationed as lookout on top of the cars on the float; that he had to take his orders from Crowley as to the movements of other vessels; that Crowley had no license; that it was his first night on the Wrestler; that he had never before acted as lookout on a boat where the pilot house would not permit the pilot to see across the cars; that the master of the Wrestler did not, at first, when the Palmer blew two whistles, see the Palmer, and did not know what sort of a tow the Palmer had, but that he asked Crowley whether he could clear her all right, and, upon his replying in the affirmative, answered with two whistles, and did not change the heading of the Wrestler, but, being again told by Crowley that he thought they would clear, kept on, so that, as he admits, he had "not swung up the river any more from the time that the lookout reported the presence of the Palmer up to the time of the collision," and he did not begin to back until the boats were about sixty feet apart, about four seconds before the collision, when Crowley either first told him he didn't think they could clear, or he, Warrington, saw the light on the Palmer and realized they could not clear. The evidence of witnesses on both sides establishes the fact that there was sufficient room for the Wrestler to turn and go up the river when the signals were exchanged. Her master says as follows:

"She should have straightened up two-thirds of the way over the river. * * * Q. You had it (the wheel) working so you were pointing up the river five points at that time (when he was in the center of the river). How much space would you need, do you think, to overcome the other three points so as to be headed straight up? You would not want much space then, would you, if you were pointing up five points? A. I would not want a great deal of space. Q. Would you want half the length of the float to overcome three points so as to be headed straight up? You were on a swing at the time and had succeeded in getting five points up the river. Do you think you would need more than half the length of your float to do it? A. I would not have needed more than half the length of the car float. * * * Q. Do I understand on your cross-examination that you could swing your boat three points in half the length of the car float? A. She should have swung around in the distance that I had. * * * Q. When you get a swing on your float that you have in tow and get it swinging as much as five points, it is very easy then to continue swinging, when you get her started, isn't it? A. Yes, sir. Q. Don't you think in slack water, you having swung five points, that you could have made the other three points in running less than 60 feet in slack water? I want you to think about it; haven't you seen the tugs do it? A. Yes, sir; I have. Q. A good many times? A. Yes, sir. Q. An ordinary equipped tug can do it in that time and space? A. Yes, sir."

Therefore, if her failure to swing up the river resulted from her continuing to go from the center of the river toward the Brooklyn shore and over into the slack water, it would seem to be due to the··

fact that the master and the lookout were incompetent or negligent, and, as they both admit, erred in judgment as to the possibility of clearing the Palmer and avoiding the effect of the slack water by going ahead under a starboard helm. This conclusion is supported by the subsequent conduct of the master. As soon as he saw the Palmer he knew the lookout had been mistaken, and then, when it was too late, he attempted to stop and reverse, and with his boat still drawing ahead he struck the Palmer, which had reversed and was making sternway. The defense of the Wrestler as to her own course is therefore not sustained. It nowhere appears that it was necessary for her to hold her speed after the exchange of the two whistles. It follows that the Palmer was not in fault in failing to reverse and thus provide against the faults committed by the Wrestler. The foregoing conclusions dispose of the further claim that the Palmer is liable for the collision because she was on the port side of the channel and close to the Brooklyn shore, in violation of the statute, but in accordance with the usual custom of navigation.

As was said by Judge Wallace, in delivering the opinion of this court in Long Island R. Co. v. Killien, 67 Fed. 365, 367, 14 C. C. A. 418:

"Doubtless the Garden City was not being navigated as near as possible in the center of the river, as the terms of the state statute, applicable to the East river, required; but this, as we have frequently had occasion to decide, should not condemn her for the consequences of a collision, which, notwithstanding her presence there, would not have occurred if the other vessel had exercised ordinary care to avoid it. Only such vessels can invoke the violation of the statute as an actionable fault as have been prejudiced by it, either because their own movements have been embarrassed by the presence of the offending vessel or because they have omitted to take some precaution in ignorance of her presence, which they might otherwise have avoided danger by adopting."

In The Clara and The Reliance, 55 Fed. 1021, 1023, 5 C. C. A. 390, this court said:

"The more difficult question in the case is whether the Clara is also to be deemed in fault for the collision. The only fault which can be imputed to her is that of navigating too near the New York shore, in disregard of the state statute which required her to be navigated as near as possible in the center of the river. But she is not to be condemned if her fault was a remote one, and not a proximate cause of the disaster; and the real question as regards her liability is whether her fault was not one of that description. Although she was improperly beyond midriver, she was not so near the shore as to embarrass the Reliance in rounding the Hook if the latter had been properly navigated."

When the Palmer blew her two whistles, indicating a desire to pass to starboard, the master of the Wrestler knew that the Palmer was proceeding on the Brooklyn side of the channel in violation of the statute. He also knew, or it was his business to know, what was the condition of the tide and eddy in the river at that time and place. If, by reason of the position of the Palmer, the request evidenced by the signal of two whistles was likely to embarrass the Wrestler in her movements, she had the right, as the privileged vessel, to refuse to comply therewith. By her acceptance of the Palmer's signals she assented to the proposed arrangement, and there is no evidence

that the maneuver thus agreed upon was a dangerous one. The Wrestler, therefore, cannot complain of a violation of law on the part of the Palmer, to which she had expressly assented when it appears that there was ample opportunity for the vessels to execute the maneuver as agreed upon, and that while there was not subsequent fault in the navigation of the Palmer, the collision was directly due to the negligence of those on board the Wrestler.

The decrees are affirmed, with interest and costs.

COXE, Circuit Judge. I am of the opinion that the decrees of the District Court are clearly right and should be affirmed. The negligence of the Wrestler was so obvious and so gross that nothing further is needed to account for the collision.

The situation is made plain by the following diagram:

There was no vis major. The night was clear and all conditions of wind and tide were normal. The river at the place of collision is 1,400 feet wide between the pier heads. The tide was the last of the flood and, on account of the turn in the river below the Brooklyn Bridge, sets on the New York shore leaving slack water on the Brooklyn shore. There was nothing affecting the situation at or prior to the collision that an experienced pilot should not have known.

On the night in question the Wrestler, with a car float lashed to her port side, emerged from her slip on the New York side of the river intending to go up stream. Instead of doing so she zigzaged diagonally across the river and struck the Palmer's port car float when she was only 100 feet off the Brooklyn shore.

The contention that she got into this position without fault on her part is almost tantamount to the assertion that it is impossible for a tug and tow to proceed up the river from a New York slip without danger of crashing into the docks on the Brooklyn side.

The evidence is overwhelming that a tug prudently navigated has no difficulty in straightening on her course near the middle of the river and that no one familiar with river navigation ever heard, previous to the Wrestler's exploit, of a tug making such a wide detour. The task which the Wrestler was called on to perform was an exceedingly simple one; it was a task which is performed by a myriad of vessels, night and day without mishap.

It is suggested that the tug was caught in the eddy or slack water on the Brooklyn side, but this is only a surmise. The tug's pilot when asked why she did not swing up stream more rapidly answered: "I don't know unless it was that she was too far over to the Brooklyn shore in slack water, and with her stern out in the tide to balance things." Even if right in this conjecture it does not exculpate the Wrestler, for her master should have known the condition of the tide and should have guarded against it.

It is not necessary to discuss the details of the Wrestler's negligence; they are fully stated in the opinion of Judge TOWNSEND. By recklessly invading the water, which, with her consent, the Palmer had a right to occupy, the Wrestler is brought within the rule that where the fault of one vessel is plain and sufficient to account for the collision there must be clear and convincing proof to make a case for apportionment. "Any doubts regarding the management of the other vessel, or the contribution of her faults, if any, to the collision, should be resolved in her favor." The Umbria, 166 U. S. 404, 409, 17 Sup. Ct. 610, 41 L. Ed. 1053; The Victory & Plymouthian (D. C.) 63 Fed. 631; Id., 168 U. S. 410, 423, 18 Sup. Ct. 149, 42 L. Ed. 519.

The accusations against the Palmer are: First: That she had no lookout. Second: That she was on the wrong side of the channel. Third: That she should have reversed sooner. Lorsen, the master of the Palmer, was at the wheel, Osterhout, the mate, was in the pilot house acting as lookout and Stewart, a licensed pilot, was in charge of the floats and between them when the signals were exchanged. It is unnecessary to determine whether the lookout should have been at the bow of one of the floats or on the top of the cars, for the reason that the men in the pilot house saw the Wrestler soon after she appeared outside her slip and had her in full view from that time until the collision. They knew all that could be known; a score of lookouts could have added nothing to their information.

The proposition that the Palmer was at fault for coming down on the Brooklyn side cannot be maintained. It appears that there is a well-recognized custom, when the tide is at flood, for ascending vessels to take the New York side and descending vessels to take the Brooklyn side between the Navy Yard and the bridge. Trevail, master of the ferryboat Union, testifies:

"The flood tide sets, comes and strikes about the bridge abutment of the New York side and works along on that shore. It is the strongest tide all the way up to the Hook. Under the circumstances which prevailed this night vessels coming down always keep on the Brooklyn side. * * * If there was on the other side a float coming up underneath the bridge they generally go up sideways; if a float was coming down on the other side they wouldn't have no show to clear at all."

In this way both vessels are able to take advantage of tide conditions. Prudence and convenience alike seem to require that such a course should be taken. Not only was this the general rule but it was made the subject of a special convention between the tugs on the night in question. By answering the Palmer's signal the Wrestler assented to the proposition that they should pass starboard to starboard. In carrying out her agreement the Palmer went as near to the Brooklyn docks as safety would permit; this was conceded at the argument. The Sammie (C. C.) 37 Fed. 907, 909; The Titan (D. C.) 44 Fed. 510, 512.

The principal charge of negligence against the Palmer is that she should have stopped and reversed. She did stop and reverse, and, when the blow was given, she was actually making sternway. But she is criticized for not having reversed sooner. It must be remembered that when danger of collision became imminent it was not a question of minutes but of seconds. As soon as the Palmer became convinced that the Wrestler intended to take the entire river to execute a simple maneuver she did everything in her power to prevent the collision. The appellant's argument proceeds upon the unwarrantable assumption that the Palmer was bound to anticipate the Wrestler's erratic course.

It is thought that in the case of meeting vessels each is justified in presuming that the other will act with reasonable prudence. In such circumstances a master is required to guard against all ordinary, expected and probable dangers, but he is not required to presume that the other vessel will execute an extraordinary and unprecedented maneuver. The Palmer could not foresee that the Wrestler, having the tide to assist her in making a simple turn up stream, would cross the river and strike the Palmer's port float when only a hundred feet from the Brooklyn docks.

For these reasons I concur in the opinion of the court affirming the decrees.