## LA BRETAGNE.

(District Court, S. D. New York. October 30, 1906.)

1. COLLISION—STEAM VESSELS MEETING—MUTUAL FAULT.

The steamship La Bretagne, passing out to sea from North river, when in the main channel, opposite Liberty Island, met a tug with a car float on each side coming up on the west side of the channel, the two vessels being then on courses to pass safely starboard to starboard. The Bretagne gave a signal of one whistle and ported her wheel. The tug did not answer the signal, but the Bretagne kept her course to starboard. Both blew danger signals and reversed, but too late to avoid collision; the Bretagne striking the starboard tow on the starboard side. *Held*, that the Bretagne was clearly in fault for attempting to pass to the right under the circumstances without the tug's consent, and that the tug was also in fault for being on the wrong side of the channel in violation of arti-

cle 25 of the inland rules (30 Stat. 96 et seq. [U. S. Comp. St. 1901, p. 2883]), without which the collision would not have occurred.

[Ed. Note.—Signals of meeting vessels, see note to 30 C. C. A. 630.]

**2. SAME—NAVIGATION OF NARROW CHANNELS—APPLICATION OF RULE.**
The main channel opposite Liberty Island, New York Bay, which is there 4,500 feet wide, is a narrow channel to which art. 25 of the inland rules (30 Stat. 96 [U. S. Comp. St. 1901, p. 2883]) applies, and requires steam vessels when safe and practicable to keep to the side which is on their starboard hand.

In Admiralty. Suit for collision.

Butler, Notman & Mynderse, for libellant.

Edward K. Jones, for claimant.

ADAMS, District Judge. This action was brought by the Baltimore & Ohio Railroad Company against the steamship La Bretagne to recover the damages arising from a collision between that steamship and libellant's car float 160 N. in tow on the starboard side of the tug Narragansett. This float was laden with 14 cars, 9 of which were forced overboard and injured, with their contents. The damage is alleged to have amounted to $30,000. The collision occurred near Liberty Island, New York Harbor, between 10 and 11 o'clock in the morning of the 17th day of March, 1904. The tug had another shorter float, No. 67, on her port side, and was bound from St. George, Staten Island, to pier 32 North River. The Bretagne, about 550 feet long, was proceeding to sea from her pier at the foot of Morton Street, North River, at the rate of from 8 to 10 miles an hour. The tug was 95 feet long, the starboard float about 300 feet long and the port float was about 200 feet long. The sterns of the floats were somewhat, 15 or 20 feet, aft of the stern of the tug. They both projected considerably ahead of the tug, the starboard one at least 150 feet. She was proceeding at the rate of 4 or 5 miles per hour. The weather was fair and the tide was ebb.

The claim of the libellant is that the Narragansett and tow were proceeding up the extreme westerly side of the channel close to the anchorage ground in order to escape the current of the ebb tide, and the Bretagne was coming down the middle of the channel bound to sea, and the vesesls as they approached were bearing on the starboard of each other; that when a comparatively short distance apart, the steamer blew a signal of one blast, hard-a-ported her wheel and took a rank sheer to the westward, bringing about the collision by the steamer striking with her stem the starboard float on her starboard side, about a third of the length of the float from the forward end, seriously injuring the float and causing her to sink to the water's edge and the 9 cars mentioned to run off the rails and overboard; that the collision occurred notwithstanding the efforts of the tug to avert it by blowing danger signals and reversing her engines full speed. The steamer is alleged to have been in fault, (1) in not maintaining a vigilant lookout, (2) in proceeding at too high a speed and in not seasonably slowing, stopping or reversing, (3) in not continuing on a course calculated to carry the vessels safely past each other starboard to starboard and in attempting to cross the bow of the Narragansett when the vessels were

too close together to permit such a manœuvre to be safely made and (4) in not taking seasonable measures by the use of her whistle or otherwise to pass the Narragansett and her tow in safety, and in not seasonably indicating her intention of porting her wheel and passing to the westward.

The claim of the Bretagne is that she left her pier at 10 o'clock in the morning, under the charge of a duly licensed pilot stationed on the bridge where she also had her commander, with a full corps of quartermasters and able seamen properly stationed and all attentive to their respective duties; that she proceeded down the channel without special incident until she neared the Statue of Liberty keeping at that point to the right of the channel on a course of S. S. W. and while thus proceeding, and at half speed, those in charge of her navigation noticed about three quarters of a mile ahead and about one half point on her port hand, the tug and her tow of two car floats; that the Bretagne then gave a signal of one blast to indicate to the tow that she would pass on the port side and went to the starboard a few degrees but her signal was not answered; that when the vessels were about 1200 feet apart the tug changed her course across the course of the Bretagne, whereupon the latter's engines were slowed and she gave another blast of her whistle and swung further to the starboard; that the tug without answering the signal of the Bretagne, proceeded across the latter's course, whereupon she reversed her engines full speed and gave the alarm signal but before her speed could be fully arrested, the vessels collided. The Bretagne alleges as faults on the part of the tug, (1) she did not maintain a proper lookout, (2) she wrongfully attempted to cross the bows of the Bretagne, (3) she omitted to turn to her starboard, (4) she refused to yield to the Bretagne and persisted in crowding the latter in her efforts to pass along the starboard side of the channel and (5) she omitted to slacken her speed and stop and reverse in time.

The testimony on the respective sides supports the contentions in a general way, but outside testimony makes it clear that the vessels were on courses to pass safely starboard to starboard if neither had changed. Such testimony comes from several tugs navigating in the vicinity. The Nettie Tice was going up the channel astern of the Narragansett, towing 3 coal laden canal boats bound from Elizabethport, New Jersey, to Jersey City. Her master said that the Narragansett passed her on the port side, on a parallel course; that the Tice saw the Bretagne approaching head and head with herself and broad on the Narragansett's starboard on a course shaped to pass fully a thousand feet to the eastward of the latter's course; that at this time the Tice blew the Bretagne a signal of one whistle and a few seconds afterwards the latter blew a similar signal; that then, after proceeding about a length, the Bretagne started to sheer to starboard and approached the Narragansett, whereupon the latter blew danger signals, which were immediately followed by similar signals from the Bretagne and both vessels reversed but too late to avoid the collision. The effect of the reversing was to bring the Narragansett to a substantial stop in the water but was not sufficient to fully stop the headway of the

Bretagne, which, aided by the tidal current, was going forward at the time of impact. The master of the tug Overbrook, proceeding up the bay and having passed between the vessels corroborated this account except as to the distance there would have been between the Bretagne and Narragansett in passing. He estimated it at 500 or 600 feet. The tug Independent, heading about south, was passed by the Bretagne on the tug's port hand. The master saw the vessels in collision near the anchorage grounds and attributed it to a sheer on the Bretagne's part. The tug N. Y. Central No. 10 was taking a lighter from the Erie Basin bound up the North River. The master saw the Bretagne coming down off Castle William and the Narragansett going up to the westward. He heard the danger signals and noticed a change of course on the part of the former to the westward of about 4 points, bringing about the collision. The tug Charles Runyon was coming up the bay from Barren Island to the North River, slightly to the starboard of the Tice and about 1000 or 1200 feet to the eastward of the Naragansett. The master saw the Bretagne coming down on a course parallel with that of the Narragansett. He heard the Tice's signal of one whistle and the steamer's answer, then saw the latter haul sharply to the starboard and rather exaggerated her sheer, which he said was almost across the channel. He then saw the collision. There were numerous other witnesses from these outside vessels in court but the advocate for the Bretagne objected to their examination as being merely cumulative and stipulated that their testimony would agree with that already given, whereupon the Narragansett agreed not to examine them.

The testimony of the pilot of the Bretagne was that when he saw the tug and floats, they were slightly on his port hand, about ½ point, and headed to pass in that way; that the steamer then off Bedloes Island, was slowed and blew a signal of one whistle; that the Narragansett did not respond to the whistle but sheered slightly to starboard and showed the port side of the western float, whereupon he ordered the steamer to proceed at half speed again; that everything then appeared clear, and the steamer went on, when suddenly the tow took a sheer to the westward, the steamer then blew one whistle and slowed and immediately afterwards reversed but the collision took place 200 or 300 feet to the eastward of the anchorage buoys. This contention was not fully sustained by the master who was on the bridge, who said he saw the starboard side of the tow looking as if it was trying to cross the steamer's bow and go to the western part of the channel and he asked the pilot "Why do you come on starboard?" The master evidently regarded a wrong manoeuvre the steamer's change to the right under the circumstances but subsequently appeared to agree with the pilot and did not relieve him of the command. His testimony was practically the same as the pilot's with respect to the positions of the vessels and the other witnesses for the steamer sustained, in a general way, the pilot's contention.

The great preponderance of the testimony shows that the vessels were in positions to pass safely starboard to starboard and that the collision was produced by a change on the part of the Bretagne to

the starboard, without an agreement to that effect with the tug. I had no doubt of this at the time of the trial and an examination of the minutes of the testimony confirms my belief that she was primarily in fault for the collision. The Narragansett did not have a lookout but it appears that the accident did not occur by reason of the absence of one and such circumstance should be disregarded.

The troublesome feature of the case is the fact that the tug and tow were on the wrong side of the channel under article 25 (Act June 7, 1897, c. 4, 30 Stat. 96 [U. S. Comp. St. 1901, p. 2883]), which provides that in narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel.

The channel here was about 4500 feet wide. I have had occasion to conclude in several cases recently (verbal opinions delivered in court) that the Hudson River opposite New York, where it is about the same width, was within the rule. It has been stated on appeal in The Bee, 138 Fed. 303, 306, 70 C. C. A. 593, referring to a collision occurring off Bay Ridge, where there are two channels, that the rule did not apply when the channels made an entire body of water, though it does with respect to each channel further down the Bay, where they are separated. In the vicinity of this collision, there was but one channel, that is the main one, in which both vessels were navigating. No reason appears why the rule should not be applied in this case, unless the circumstances were such as to exclude its operation. It is urged that the proximate cause of the collision was the sheer of the Bretagne to the starboard, and The Lowell M. Palmer (C. C. A.) 142 Fed. 937, is cited to sustain the proposition that she should be held solely liable. That was a case of collision in the East River where the tug Wrestler starting from New York and bound up the river with a tow alongside brought about a collision with a descending tow, alongside of the tug Lowell M. Palmer, near the Brooklyn shore. In that case there was a two whistle agreement which required the Wrestler to pass the Palmer starboard to starboard, which the former failed to comply with, alleging that she found it impossible because of an eddy which prevented her bow from swinging up the river. The court however disregarded this excuse of the Wrestler and held her solely in fault. It was concluded that the Palmer was not in fault because the Wrestler could not complain of a violation of law on the part of the Palmer as there was ample opportunity for the vessels to execute the manœuvre agreed upon, the Palmer having gone as near to the Brooklyn shore as safety would permit. The principal distinction between that case and the one under consideration is that there was no agreement to pass to the right. The Bretagne sought to make such agreement but it was not assented to by the tug, which did not answer the former's navigating signals but stopped and backed upon receiving the signal of the Bretagne and seeing her sudden sheer. The tug was aided by the tide in her efforts to stop and probably had overcome her headway at the time of the collision so that there was no observable fault on her part, except that of being on the wrong side of the channel.

148 F.—31

Of the Narrow Channel Rule, it is said in Hughes on Admiralty (250):

"This is really a branch of the port-helm rule. The latter rule applies when the vessels are meeting end on, no matter whether they are in a harbor or a narrow channel, no matter whether they are following a channel or crossing it. The starboard-hand rule emphasizes this duty as to narrow channels. It means that each must keep along its own right-hand side, no matter how the relative bearings may be from sinuosities or other causes.

"This rule was only added to the inland rules by the recent act of June 7, 1897 (30 Stat. 96, c. 4 [U.·S. Comp. St. 1901, p. 2883]), though it had been in the International Rules since the revision of 1885. The courts, however, are rigid in enforcing it."

Of course, if there had been an agreement to go to the left the Bretagne would be solely liable under The Bee, supra. In the absence of such an agreement, I am unable to see how the Narragansett can be wholly exonerated. Her presence on the western side of the channel was clearly a contributing fault because if she had been where the law required her to be, there would have been no collision.

Decree for the libellant for half damages, with an order of reference.