Morris, D. J.
This collision occurred off North Point Light, in the Brewerton channel of the-Patapsco river, about 5 o’clock in the afternoon of January 13, 1880. The British steamship "Winthrope, 1,500 tons, with a cargo of iron ore, had entered the river and was proceeding up the channel for Baltimore at eight miles an hour. The steam-tug Alice M. Ehrman, towing the bark Kate Irving, 710 tons, laden with grain, had just left the port of Baltimore, and was proceeding down the channel at about four miles an hour. The channel is about 350 feet wide.
The case on behalf of the steamer Winthrope is that the tug, when about a mile and a-half off, blew one blast of her whistle, indicating that she intended to pass the steamer port to port; that the steamer responded with one whistle, ported her helm, and kept near the northerly bank of the channel; that when some 300 or 400 yards off the tug again blew one *920 whistle, to which the steamer responded, and putting her helm hard a-port ran so far to starboard that she ran upon a buoy on the northernmost edge of the channel; that the tug had also ported her helm, but had so little power, and the bark was so badly managed, that although the steamer passed the tug without accident, and although the bow of the bark was drawn out of the way, the stern of the bark swung around, and her port quarter came into contact with the port side of the steamer, about eight feet from her stern, and seriously damaged her.
The case on behalf of the tug is that she saw the steamer coming up the middle of the channel, about three or four miles off, and having a heavy, deeply-ladened ship in tow, she desired, in passing the steamer, to go to the windward, or northerly side of the ehannel, and accordingly, when the steamship was a little over a mile off, she gave not one, but two blasts of her whistle; that te this she received no reply, and, being herself in the middle of the channel, she continued some minutes without changing her course, in expectation of a reply, when, perceiving that the steamer had already got somewhat to the north of the middle of the channel, she gave one blast of her whistle, at the distance of a half a mile apart, to which the steamer at once responded; that the helm of the tug and that of the bark were immediately ported, and both tug and tow went gradually to' southward, and the helm of the steamer being apparently at the same time ported, she went off to northward, but was so badly steered that she ran upon one of the buoys marking the northernmost edge of the channel, and immediately thereafter took a strong sheer to port, so that, as she passed the tug, her direction was at a considerable angle with the line of the channel, and four men were seen at her wheel putting it over hard a-pOrt; that the steamer began to yield to the port helm, and by the time she got to the bark, which was being towed 300 feet behind the tug, she had rounded somewhat to starboard, but nevertheless she struck the bark on her port quarter, about 80 feet from her stern, with the anchor of the steamer, which was improperly hanging over the port bow, and considerably damaged the bark; *921 that the steamship was moving at the rate of eight or nine miles an hour, and, in approaching the tug and tow, did not lessen her speed.
The libel on behalf of the bark charges the blame of the collision upon both the steamer and the tug; upon the tug for giving conflicting signals, and upon the steamer for not Blowing or stopping, and for improper steering. It is obvious that the care and skill required to enable a large steam-ship and a tug, encumbered with a heavy tow, to pass each othei in the Brewerton channel, without risk of collision, have not been exercised in this case. The wind was light, the water smooth, and the day clear, so that there was nothing but want of seamanship to account for the collision. That the tug did not do all that, in the exercise of proper skill and diligence, she should have done, appears, I think, from the testimony of her own officers and from the admitted facts. Her master states that he did at first propose to take the northerly side of the channel, and gave notice to the steamer of his intention by two blasts of his whistle when a mile and a-half off. He states that he got no reply, but kept on down the middle of the channel, until within half a mile of the steamer, without giving any other signal, or at all changing his course. Notwithstanding he received no answer to his signals, from which the inference was that they were not heard, it appears that he must have continued his course as if he were going to the northernmost side of the channel for some five minutes without repeating them. Then, seeing that the steamer had gone to the northernmost side, he gave one blast, to signify that he was going to the southernmost side, which was responded to by the steamer, and then, he says, “we changed our wheel a Uttle to port.”
The engineer of the tug who executed the master’s orders shows how little this porting was. He says: “When half a mile off the captain ordered me to blow one whistle. The steamer was then tending a little to the north side of the channel. I blew one whistle and had ported my wheel about a minute or two when the eaptain told me to steady her.” It is not surprising that, being encumbered by a tow quite suffi *922 ciently heavy to tax her capacity, this brief porting of the tug’s wheel had but little effect upon the position of the bark. It is evident that the tug wished to keep as near as she could to the northern bank of the channel, because there was the deepest water and the least risk of her tow grounding, and with this fact before me, and the testimony of her own officers as to how little and how late she ported her wheel, and with the testimony of those on the steamer as to how near to the north bank the bark was at the moment of collision, I have no difficulty in believing that the bark was well north of the center of the channel, and that the tug was in fault in taking the bark dangerously and unnecessarily near to the course of the steamer.
The other question presented is, was the steamer also to blame ? 'The testimony shows that the steamer was proceeding at nearly if not quite full speed. She was in command of one of the regular Chesapeake bay pilots, and he has testified that in his judgment it was safe and prudent for him to bring the steamer up the channel at that speed, notwithstanding there was in sight ahead of him, a tug encumbered with a tow.
But several others of the Chesapeake pilots, of equal skill and experience, have unqualifiedly expressed the contrary opinion. They say that in the Brewerton channel, if there is no obstruction of any kind ahead, and every vessel within reasonable distance is well put of the way, so that the channel appears free, they deem it safe to proceed at eight or even ten miles an hour; but they all agree that it is not prudent, and that it is never their practice, to run a steam-ship eight miles an hour (if she is of such draft that she must .keep to the channel) when approaching ■& tug and tow. Their testimony is that in such cases they invariably slow the steamer down to half speed, so as to have her perfectly in hand.
If we take the statements of the witnesses on board of the Bteamer to be literally true, it is evident that to them the ohannel must have appeared very much obstructed. They testify that although at the moment of passing the tug the •teamer was so near the northernmost bank of the channel that *923 she struck one of the buoys, yet that the tug passed so near them that, as the captain of the steamer says, he “eould have nearly jumped on to the tug from the steamer’s bridge.” The pilot himself testifies that when they collided with the bark the steamer’s bow was only about 30 feet from the line of the buoys on the northernmost side of the channel.
These statements show conclusively that the pilot and captain of the steamer could not have regarded the channel as clear, and as, according to their own testimony, they saw that the tug and tow were on the extreme northern edge of the channel, they knew that there was no possibility of them passing in safety unless the tug and tow succeeded in getting out of the way. The pilot gives the situation, as it appeared to him, when he says “that he had no apprehension of danger until he found that the bark was not getting out of the way sufficiently to give him room to pass.” It is true that vessels meeting each other end on, at a considerable distance from each other and with plenty of sea-room, have a right to proceed at full speed, each having a right to act upon the assumption that the other will perform its duty. But this rule is not applicable to the navigation of the Brewerton channel by large vessels, of heavy draft, and I think it plainly appears that the rule with regard to speed, which the testimony of the pilots, who were examined as experts, shows has been generally adopted by them, is, in so narrow a water, only a reasonable and necessary precaution against danger.
It appears to me, however, from the testimony, that the captain and pilot of the steamer are somewhat mistaken in supposing that the tug and bark had not succeeded in getting further from the north edge of the channel than they represent in their evidence. It would seem that there was another cause which contributed to bring the vessels into collision, and which they underestimate. This cause was the fact that about the time the tug passed the steamer, which was also nearly about the same time that the steamer ran on to the buoy, the steamer took a decided sheer to port away from the north side of the channel and headed for the bow of the bark, and at quite an angle with the direction of the buoys. *924 What it was that caused this sheer the testimony does not satisfactorily establish. It may have been bad steering in the attempt to steady the ship on her course after she ran on to the buoy, under the excitement of apprehension that she was in danger of grounding, or it may have resulted from a tendency which some ox the witnesses say vessels have to sheer off when approaching shallow water.
That the steamer did make such a sheer is satisfactorily established, not only by the direct testimony of those on board of the tug and bark, but also by the facts and admissions contained in the testimony of those on the steamer. These latter testify that they had the helm hard a-port when the steamer was 300 or 400 yards from the tug; that even after she ran on to the buoy her helm was never put to starboard, and it also appears that when the steamer was abreast of the tug the captain and pilot were assisting the two wheelsmen in the attempt to get the wheel still more to port. So that it seems evident that if the steamer had not taken a sheer she must certainly, under a hard a-port helm, have run outside of the buoys. One great danger of a high rate of speed is the short time allowed in which to rectify any error of judgment or counteract any unexpected occurrence; and, whatever may have been the cause of the sheer, no collision would probably have occurred if a less rate of speed had allowed more time to overcome it or more time for the bark to escape from it. In navigating such a channel allowance must be made for unusual emergencies, and precaution and care must be increased in proportion to the increased risk and difficulties; and in this case I have been unable to bring my mind to any other conclusion than that the tug was in fault in delaying until so late in getting herself and her tow out of the way of the steamer, and that the steamer was also in fault in maintaining her full speed up the channel in the face of such obvious obstructions. The bark appears to have governed her movements in strict conformity to those of the tug, and not to have been in fault.
It therefore results that the whole damage is to be equally borne by the tug and the steamer.