## THE GEORGE L. GARLICK.

(District Court, E. D. New York. December 30, 1898.)

1. COLLISION — STEAM VESSELS PASSING — RESPONSIBILITY FOR EXECUTION OF SIGNALS.

Where steam vessels are meeting head to head, the greater responsibility for the due execution of the signal to pass rests upon the vessel initiating the maneuver.

2. SAME—DUTY TO ABANDON MANEUVER.

When one of two meeting vessels has given a proper signal for passing, which has been accepted by the other, and the latter has done her part to execute it, the evidence must be strong to justify a court in holding her in fault for a collision because she did not interrupt the maneuver, in the course of its execution, on perceiving that it was not being properly executed by the vessel that initiated it, as it was her duty to hold to the course agreed upon until all doubt that the other vessel would not or could not observe her own signal had been dispelled.[1]

---

[1] As to signals of meeting vessels, see note to The New York, 30 C. C. A. 630.

This was a petition by Peter Cahill, Jarvis Masters, and Michael Moran, owners of the steamer George L. Garlick, for limitation of liability as to claims growing out of a collision.

Carpenter & Park, James E. Carpenter, and James K. Symmers, for The George L. Garlick.

Cowen, Wing, Putnam & Burlingham and Charles C. Burlingham, for barge James Cottingham.

James J. Macklin, for Home Ins. Co.

George W. Smith and Avery F. Cushman, for claimant Haupt.

THOMAS, District Judge. On the 14th day of June, 1890, at about 12 o'clock m., the stem of the steam tug George L. Garlick, with a loaded or partially loaded car float on her port side, collided with the projecting port bow of the barge Cottingham, loaded with sugar, towed on the starboard side of the lighter General Sigel, carrying some 150 bags of sugar, about opposite Hamilton Ferry, in the East river. The day was fair, the tide was the last of the ebb and slight, and the wind was light and from the eastward. The Cottingham, with her cargo of sugar, was sunk, and the fireman of the Sigel was killed or drowned, for which several injuries claims for damages are made against the Garlick.

The first essential question relates to the position of the tugs in the river. The Garlick was bound up, and the Sigel was bound down, the river. Were the tugs so headed, with reference to each other, as to justify the Sigel's signal to pass to the left, and the acceptance of such signal by the Garlick? That the tugs were approaching each other substantially head and head is stated generally by the witnesses. There is, however, much evidence that the Sigel was somewhat to the starboard of the Garlick, so much so that their courses, continued, would cause the vessels to pass starboard to starboard. In such case, the attempted maneuver of passing on the starboard side was proper, and, even if the vessels were meeting head and head, no witness has criticised the propriety of the Sigel's signals to pass to the left, accepted by the Garlick while the vessels were some 1,500 feet apart. The James Bowen, 10 Ben. 430, Fed. Cas. No. 7,192. The evidence preponderatingly shows that the Sigel was the further from the New York shore, whatever the relation to the vessels in the matter of heading. The stem of the Garlick struck the Cottingham on her port side, about three feet abaft the latter's stem, and cut her down to the water's edge. To effect this result, the Garlick, at the moment preceding the collision, must have been approaching the Cottingham on the latter's port side. This is shown by the diagram of Kuhle, the Sigel's deck hand, and by the diagram of Cutler, the captain of the Garlick. But if the vessels were approaching with the Sigel to the starboard of the Garlick, or even head and head, how did the Garlick's stem come on the port bow of the Sigel? Such a blow could arise (1) by the Sigel attempting to go across the Garlick's bow, or (2) by the Garlick going to the starboard, and getting on the Cottingham's port side.

The second alternative seems to the court impossible, and the evidence is too manifestly against it to permit the finding of such fact. The evidence is convincing that the Garlick, at the time of exchanging signals, was not so heading that she could have delivered the blow on the port side of the Cottingham, at the angle shown; and, moreover, the evidence is plainly preponderating that the Garlick changed her course after the exchange of signals, so that her bow was pointed somewhat towards the New York shore. There are several reasons for believing that the Sigel did not go to port, but ran across the Garlick's bow. As has been stated, it is difficult to conceive of the Garlick getting around on the port side of the Cottingham, and swinging then to port, so as to strike at the angle indicated. The evidence of many witnesses, some of them disinterested, shows that the Sigel was pointing for the New York shore, and did not change her course to port after the signals; and the same evidence shows that, after the signals, the Garlick was pointed towards the New York shore. If the Sigel stopped and backed, as is claimed, she could not be shoved more to port by starboarding, although the backing, with the Cottingham on the starboard side, would tend to send the Sigel to port. The tide might tend to send the Sigel's bow to starboard. It is true that Kuhle says that the Sigel went to port, and his diagram shows this, as it also shows the Garlick swinging to port. But he says:

"He [the captain of the Sigel] hove her hard to starboard. How much she answered the helm I couldn't say."

Yet he says she answered the helm, and swung to port. No other witness pretends to state that the Sigel swung to port. However, the engineer of the Sigel states that:

"When I looked out of the door, we were swinging to port. When I saw the Garlick on the port bow, we were swinging to port. The only sight I could take was from the South Ferry slip. Q. Do you mean you looked out over your quarter? A. Yes; right through by the stern of the boat."

This is understood to mean that the Sigel swung so far to port that the engineer could look from his port door, over the stern, and see South Ferry. This statement is quite easily overcome by all the evidence in the case, and is not accepted. How, in such a case, could the Garlick, further to the south and west, have reached the Sigel's port side? It would have been impossible. The conclusion is reached that the Sigel did not change her course to the port sufficiently to take her off the course which she was pursuing at the outstart, but, rather, that she pointed more distinctly for the New York shore. This finding is necessary, in view of the greater weight of evidence, and, indeed, it seems the only reasonable way of accounting for the Garlick's stem angling upon the Sigel's port bow, unless the Garlick could be deemed in some way to have gone about on the Garlick's port side, and then to have changed her course for the New York shore. This is too extraordinary for belief, as there is much and credible evidence that the Sigel was on the Garlick's starboard bow, and further toward the Brooklyn shore, and, moreover, the proof is abundant that the Garlick, lying still in the water at the interchange of signals, covered the smaller part of the space

intervening between the vessels before the accident, and that she turned towards the New York shore. It is unnecessary to inquire what caused this failure of the Sigel. There was space enough for safe passage, but she failed to execute the maneuver, adopted by her and acceded to by the Garlick; but, instead of executing the maneuver which she demanded, she ran or drifted in front of the Garlick.

The remaining question is, was the Garlick in fault? This inquiry may be premised by the consideration that, if the vessels were meeting head and head, as is claimed by some of the parties, which claim receives much substantial support from the evidence, the greater responsibility for the due execution of the signal to pass to the left rested upon the Sigel, who initiated the maneuver. The George L. Garlick, 20 Fed. 647; The Titan, 44 Fed. 510.

There are particulars in which the Garlick was obviously not in fault: (1) In acceding to Sigel's signals. There were at least 1,500 feet between them. The Sigel was approaching the Garlick head to head, if not well over to the starboard of the Garlick; and the evidence shows that there was no reason why the projected passage should not have been executed with perfect safety. (2) The Garlick starboarded. It is true that she did not hard a-starboard at the very moment the signals were exchanged. It must be remembered that the Garlick was lying still when the passing signals were interchanged; that there was an interval of 1,500 feet between the boats, which was sufficient, and far more than sufficient, room for the execution of the proposed maneuver; and that, in respect to tide, wind, and weather, there were no unfavorable conditions. It was the duty of the Garlick to use due care not to embarrass the maneuver, and to do her share in providing sufficient passage room; but, at the outstart, at least, there was no occasion for her captain taking radical measures to avoid an unexpected, improbable, and unnecessary collision. While the captain of the Garlick states that he could swing the float without headway, such headway would undoubtedly aid her change of course to port. The pilot of the Garlick states that he rang to go ahead, and then starboarded, then gave orders to go ahead under full speed, then hard a-starboarded, and thereafter gave alarm whistles and bell to go back, but had not stopped still before the collision.

The evidence is greatly preponderating, and almost uncontradicted that the Garlick did swing to port, and that, too, substantially before the collision; and a careful analysis of the evidence leads necessarily to the conclusion that the Garlick did her full duty in the matter of carrying out the maneuver demanded by the Sigel, and that she was not negligent in submitting to the Sigel's signal for passing is established beyond peradventure. If there was any negligence in that regard, it was that of the Sigel. It may be that the evidence of the captain of the Sigel would have modified these conclusions, necessitated by the abundant evidence of the witnesses for the Garlick; but his death deprives the court of the aid of a valuable witness, and leaves substantially uncontradicted the evidence of the petitioners.

There remains, however, an important consideration. Should the Garlick, when the captain and pilot saw that the Sigel was not doing her part towards effecting a safe passage pursuant to given signals, have stopped and backed earlier? In considering this question, it must be remembered that the Garlick was not responsible for the perilous predicament. She had done her duty, while for some cause the Sigel had not, and hence the danger was induced. When the Garlick saw that the Sigel was not observing her own signals, was a new duty imposed upon her to adopt some new maneuver, one not before required, to avert the disaster? It is undoubtedly the rule that when a person, without fault on his part, is brought by another's negligence into a position where he is likely to do injury to such other person, or to a third person, the unoffending person should use due care to employ means within his control to avoid or to minimize the injury. Hamilton v. McPherson, 28 N. Y. 72; Austin v. Steamboat Co., 43 N. Y. 75; Milton v. Steamboat Co., 37 N. Y. 210; Mark v. Bridge Co., 103 N. Y. 33, 8 N. E. 243. But, when a person doing his full duty is confronted with a peril to himself or to another, he is only required to do in good faith what a man of ordinary prudence and judgment would do under the stress of existing circumstances, and he is not required to sacrifice his own safety, or to subject himself to increased hazard, for the sake of delivering the other party from the impending injury. Hence, the care required of the unoffending person depends upon the nature and extent of the peril, his knowledge thereof, his opportunity to see and appreciate it, his time and ability to act, and the probability of exposing himself to increased injury or liability by adopting any particular means of avoiding the threatened danger. As the Garlick and Sigel approached each other after interchanging signals, the moment arrived when the captain of the Garlick anticipated a collision. He states that the Sigel was 500 or 600 feet away when he saw that she was not complying with the signals. In answer to the question why he didn't blow the alarm whistles at that time, he testified:

"Because I didn't know that man's mind. I didn't know what he was doing. He was there to take care of his own boat, and he asked for what he wanted."

Martin, the pilot of the Garlick, testified:

"Q. How far were the vessels apart when you gave the bells to go back? A. * * * About 50 feet apart. Q. Had you made up your mind before that there was going to be a collision? A. I had made up my mind. I couldn't exactly state. I didn't know whether he was going to pick his barge up, the way the man did— Whoever was in the pilot house of the other boat, it seemed as if he had lost control of his boat,—either that, or had went opposite to what he blew. Q. How far apart were they? A. I couldn't exactly tell whether he was going to pick up his boat or not. Q. How far apart were they when you noticed he lost control of his tow? A. After the two whistles were blown. Q. How far apart were the vessels when you thought he had lost control of his tow, or was not complying with the signals given by him? A. After he blew his whistles. Q. How soon after? A. About two seconds after. Q. At that time they were more than 600 or 700 feet apart? A. 600 or 700 feet apart."

This witness also states that the Sigel, when first sighted, was a point and a half or two points to the starboard of the Garlick, and thereafter changed directly across the Garlick's bow, and that after it was seen how the Sigel was acting, he hard a-starboarded, and the speed of the Garlick was increased. This was one way of escaping the Sigel, and lacked little of success. This witness states that the vessels were 50 feet apart when he gave bells to go back. The captain of the Garlick testified that the Sigel was 50 feet away when he blew the alarm whistle, which the Sigel did not answer; that he then stopped his boat, reversed his engines, and gave orders to let go the car float, and that some of the lines were thrown off; and that the Garlick was about still at the time of the collision. This witness also states that the Sigel was 10 or 15 feet away when the Garlick began to back.

It does not appear that the Sigel blew an alarm whistle at any time, or in any way asked for a change of the adopted maneuver, or manifested that she was laboring under difficulty, or that she wished to be aided or delivered from trouble. There is evidence that the Sigel stopped and reversed, and was not going ahead, and was going back at the time of the collision; but at what distance from the Garlick these orders were given does not appear. While the apparent honesty of the witnesses for the Sigel induces the belief that her engines were reversed, their recollections are too obviously defective to prevent the conclusion that the Sigel was making headway under her acquired momentum, or, perhaps, under the influence of the tide, at the time of the collision. This is, at the moment, important, as bearing upon the appearance of the Sigel to those in charge of the Garlick, and what inference they should have derived from such appearance as to the Sigel's ability to complete the movement inaugurated by her. From these facts the following proposition is presented:

The Sigel, head and head with the Garlick, or, if not head and head, then to the latter's starboard, and at a distance of 1,500 feet, gave and received signals for passing to the left. The Sigel continued on her way, and assumed or continued a heading across the Garlick's bow, but stopped and reversed before the collision, without entirely losing headway; but the Sigel at no time, by alarm signals or otherwise, showed her lack of ability to execute the maneuver, or wish for a change. The Garlick, at rest when the signals were given, started under one bell, her wheel starboarded. Her speed was increased under a jingle bell; then her wheel was put hard a-starboard. At the distance of some 600 feet away from the Sigel, those in charge of the Garlick discovered that the Sigel had not changed to port, and was headed upon or across the Garlick's bow, and that, from loss of control or other cause, she was not observing the signals. The Garlick proceeded until about 50 feet distant from the Sigel, when she gave an alarm whistle. While some 50 feet apart, the Garlick gave bells to go back; but she did not acquire actual backward motion before the collision, although she may have been still in the water. The Garlick struck at an angle the Sigel's projecting barge, about 3 feet abaft the stem. Should the Garlick

have stopped, or stopped and reversed earlier, or have tried to go to starboard?

The reversing and backing of the Garlick would have swung her bow to starboard, and this would have been ascribed to her as a fault in case of a collision; for it would have been a direct violation of the accepted signal. It is, therefore, certain that such a maneuver on the part of the Garlick would not be justified, in the absence of alarm signals from the Sigel, until those in charge of the Garlick were assured that the Sigel could not pass her in accordance with the signals given by the Sigel. Pendleton, apparently a competent, honest, and disinterested witness, states that, if the Sigel had starboarded, she could have gone to port, and passed in safety, when distant 200 feet from the Garlick, provided she had been hooked up, and had her barge under control. If such was the case, the Garlick would not be required to do anything contrary to the signals, especially anything tending to carry her bow to starboard, when the vessels were 600 feet apart; for within that distance the Sigel might well be expected to sheer to port sufficiently to make a safe passage.

But was she apparently coming ahead, and did she apparently have the barge under control? As has been found, she was making headway, and no signals advising the Garlick to the contrary, or that she was not controlling her barge, were given by the Sigel to the Garlick. But the pilot of the Garlick stated that it seemed as if the pilot of the Sigel had lost control of his boat, or had gone opposite to her signals, when the vessels were 600 or 700 feet apart, and he saw, as did the captain of the Garlick, that the Sigel was laying her course across the Garlick's bow. The captain of the Garlick states that the Sigel was 500 or 600 feet away when he saw that she was not complying with the signals, but he waited until the boats were 50 feet apart before blowing his alarm whistles. It seems, in view of all the facts, that it was not negligent for the Garlick to delay giving her alarm signals, and to persist, for a time, at least, in going to port as she had been asked to do. The negligence to this time was that of the Sigel. The Garlick had done, thus far, all that she was required to do; and for her to seek to reverse her heading at this distance, without any request or alarm signals from the Sigel, would have placed the responsibility of the collision, if one happened, in whole or in part upon the Garlick. When the captain of the Garlick felt assured that the collision was impending, he did what he could to avoid it. Had he done earlier what he finally did,—that is, reverse and back,—it is by no means certain that he would have avoided the collision, and he would have incurred the inevitable criticism of having thwarted the plan for passing adopted by both vessels. The Garlick, being primarily free from fault, should not be held with great exactness to the adoption of a course that might have averted, possibly, the results of the Sigel's negligence.

After a marine accident, the offending navigators are quite ready with the accusation, against the unoffending ship, that their mistake or fault was appreciable, and that the opposite ship should

have guarded against it by departing from the prescribed rule of navigation. When one vessel has dictated the maneuver, and the other vessel has adopted and done her part to execute it, the facts should be clear, before the court should hold that the maneuver should have been interrupted, in the course of its fulfillment, because the vessel that initiated the movement failed to do her part. When a vessel is doing right, it is not always easy to determine nicely when the opposite vessel is doing wrong, and whether she will in time correct her error, and at just what time the unoffending vessel should undertake to counteract the wrong.

It may be, in the present case, that it would have been better and beneficial if the Garlick had stopped and backed earlier, thereby surely going to starboard. But, if she had done so, the burden of justifying the changed maneuver would have rested upon her, and, as she was primarily right, the burden rests on the Sigel to prove that the Garlick was finally wrong, and that such wrong proximately caused the accident. The considerations are so conflicting, and the effect of a change of plan by the Garlick so doubtful, that it must be held that the burden of proof has not been met. The Sigel originated the method of passing. Such method was a proper one, at least so far as concerns the Garlick. The Garlick accepted it, and it would have been executed in safety, but for the Sigel's failure. Such failure should draw its own consequences, and such consequences should not be cast upon the innocent party, upon the plea that she was not sufficiently alert in averting them. The master of the Garlick acted in good faith. He stopped and reversed, when he saw that the master of the Sigel would not change his course; and, if it was a mistake not to do this earlier, it was a fault of judgment, which a prudent and skillful navigator might have made under the appearances presented. ,

In The Favorita, 18 Wall. 598, it was stated:

"It is said, if the Manhasset had advanced, instead of stopping, she would have cleared the steamship. This may or may not be true; but, if true, she is not in fault for this error of judgment. It was a question whether to advance, or to stop and back, and the emergency was so great that there was no time to deliberate upon the choice of modes of escape. In such a moment of sudden danger, caused by the misconduct of the Favorita, the law will not hold the pilot of the Manhasset, acting in good faith, guilty of a fault, if it should turn out, after the event, that he chose the wrong means to avoid the collision, unless his seamanship was clearly unskillful."

The danger of premature stopping and backing is illustrated in The Britannia, 153 U. S. 130, 14 Sup. Ct. 795, where the Britannia signaled that she would keep out of the way, and pass to the stern of the Beaconsfield. The Britannia was found to be in fault for overlooking or disregarding the effect of wind and tide, so that, when she endeavored to swing to the starboard, she was unable to do so with reasonable quickness. But it was considered that the Beaconsfield was at fault for disobeying rule 23 in not keeping her course. The Beaconsfield's excuse was that the Britannia, after having signaled that she was going astern, did not appear to be doing so, and that the erratic behavior justified the Beaconsfield in stopping and reversing; but the excuse was held insufficient. See, also, The Dela-

ware, 161 U. S. 459, 469, 16 Sup. Ct. 516. While these cases involved rules not here present, they illustrate the necessity of firmly observing signals agreed upon by passing vessels, until all uncertainty as to the disobedience of such signals by one of the vessels is dispelled.

In The Delaware, it was said:

"If the master of the preferred steamer were at liberty to speculate upon the possibility, or even the probability, of the approaching steamer failing to do her duty and keep out of his way, the certainty that the former will hold his course, upon which the latter has a right to rely, and which it is the very object of the rule to insure, would give place to doubts on the part of the master of the obligated steamer as to whether he would do so or not, and produce a timidity and feebleness of action on the part of both, which would bring about more collisions than it would prevent."

Surely this language is applicable to vessels whose masters have agreed upon a certain maneuver for passing, pursuant to an applicable rule, where there are no unfavorable conditions, and where there are no apparent grounds for believing that a vessel will not or cannot observe her own signals, beyond the fact that her pilot is holding too long on his original course. It is probable that the master of the Sigel held too long on his course before he tried to go to port. Such navigation merits the vigorous expressions of Judge Lacombe, in The George S. Shultz, 84 Fed. 508:

"If the offending master has miscalculated, and held on too long, and collision results, he is usually vociferous in support of the proposition, which is, no doubt, correct, that if the privileged vessel had only stopped or changed her course, and left him free to go where he chose, no catastrophe would have ensued. This class, if it exists, and we do not doubt it does, is a standing peril to navigation. Excuse should be difficult for any master who, with full knowledge that he is the one who, under the rules, should change his course or speed or both, begins his navigation in the presence of approaching risk of collision by insisting that the other vessel shall make such changes."

In the Shultz Case the vessel at the outstart free from fault was considered negligent, because she kept on instead of reversing, but the opinion states:

"The period of uncertainty as to what the burdened vessel meant to do * * * had passed. It was plainly manifest to the pilot of the Little Silver [the privileged vessel] that the Shultz [the offending vessel] had gone so far on her improper course that it was absolutely impossible for her, either by changing course, or stopping, or reversing, to keep her tow out of the way of the Little Silver. By reversing, however, the latter could avoid collision with the tow. She did not reverse, and the only excuse offered is that she did not know there was a tow; but, if she had had a proper lookout, she would have discovered this fact."

The facts are quite different from the case at bar. When fault is traced clearly to a vessel, the innocent vessel will not be adjudged in fault for failure to avert the consequences of the fault of the first vessel, unless it be made very plain that departure from her first duty was demanded imperatively by new conditions, and that a person of good judgment at the time and place would have made such departure.

The claims against the Garlick are disallowed, and her petition to limit her liability is granted.