## THE ACILIA.

### THE CRATHORNE.

#### (District Court, D. Maryland. May 6, 1901.)

1. COLLISION—INLAND RULES—NAVIGATION OF NARROW CHANNELS.

   Article 25 of the inland navigation rules, established by Act June 7, 1897, requiring steam vessels in narrow channels, when it is safe and practicable, to keep to that side of the fairway or channel which is on their starboard side, is applicable to navigation of a channel in the Chesapeake Bay, 600 feet wide, and is mandatory, superseding all prior rules and local customs.[1]

2. SAME—STEAMSHIPS MEETING—VIOLATION OF RULES.

   The ocean steamships Crathorne and Acilia came into collision in the Patapsco river on the afternoon of a clear day, at the point where the Ft. McHenry and Brewerton channels meet, at an angle of about 28°, the channel being at that point about 600 feet wide. The Crathorne was passing down from Baltimore at a speed of 6 miles, and the Acilia, which was a large ship, 452 feet in length, was coming up at a speed of 10 knots or more. Each was in charge of a licensed pilot. When perhaps a half mile apart, the pilot of the Acilia ordered the wheel starboarded, and two blasts of the whistle given; his purpose being to pass to the port side of the channel, in accordance with a claimed local custom, but in violation of the inland navigation rules. Owing to a derangement of the whistle, the valve would not close, and but one blast was sounded, which continued until after the collision. The pilot of the Crathorne, taking the first sound of the whistle to be a signal to pass port and port, in accordance with the rules, answered with the same signal, and ported his helm. On seeing that the Acilia meant to pass across his bows, he reversed. Shortly before collision the Acilia also reversed, but made no change of course, and was making greater speed than the Crathorne at the time of collision. She did not hear the signal of the Crathorne, owing to the sound of her own whistle. *Held*, first, that the Acilia was in fault in going at a dangerous speed under the circumstances, but chiefly because of the violation of the rules by her pilot, but for which the collision would not have occurred; and, second, that the Crathorne was not guilty of contributory fault in failing to sound danger signals, which would have conveyed no information not already in possession of the Acilia, nor because she did not sooner reverse, her pilot being justified in supposing, up to the time she did reverse, owing to the direction of the channel and the course the Acilia was then on, and in the absence of a contrary signal, that she would obey the rules, and change her course in time to avoid collision; furthermore, owing to the continued blast of the Acilia's whistle when she was manifestly not in distress, the pilot of the Crathorne was confronted by a perplexing situation, without fault of her own, in which he should not be held to the highest degree of promptness and certainty in his actions.

---

[1] Collision rules, see notes to The Niagara, 28 C. C. A. 532; The Mount Hope, 29 C. C. A. 368.

In Admiralty. Cross libels in a cause of collision.

Wilhelmus Mynderse and Daniel H. Hayne, for the Crathorne.
J. Wilson Leakin and Harrington Putnam, for the Acilia.

MORRIS, District Judge. The case stated in the pleadings on behalf of the Crathorne is: That she is a steamship of 1,695 net tonnage, and on the afternoon of January 16, 1901, she left Baltimore in charge of a licensed pilot, Howard Ensor, bound for Copenhagen, laden with cargo, drawing between 21 and 22 feet, and proceeded down the Ft. McHenry channel. That the weather was clear, and vessels could be seen the usual distances. When in the vicinity of Ft. Carroll, the lookout reported 'a steam vessel on the port bow, which proved to be the Acilia, coming up the Brewerton channel to Baltimore. That, as the vessels approached, the Acilia gave a single blast of her whistle, to which the Crathorne responded with a single blast and ported. When the vessels had approached within a short distance of each other, it was observed that the Acilia, contrary to the signal, was attempting to cross the Crathorne's bow. When this was discovered, and it was seen that there was risk of collision, the Crathorne's engines were at once stopped and reversed full speed astern, the Crathorne's previous speed having been moderate. The Acilia, however, crossed in front of the Crathorne, and they collided, with the result, owing to the great size and speed of the Acilia, that the Crathorne's bow was greatly damaged, and she had to return to Baltimore; the damages to ship and cargo amounting, as the libelant now claims, to $50,000.

The case stated in the pleadings on behalf of the Acilia is: That she is a new steamship, built in November, 1900, 452 feet long, 52 feet beam, 5,697 gross tonnage, drawing, at the time of collision, 19 feet aft and 13 feet 6 inches forward. That on January 16, 1901, between 2 and 3 o'clock in the afternoon, she entered the Brewerton channel, and was proceeding to Baltimore in charge of a licensed pilot, Warren Garrison. That she was equipped with an electric automatic steam whistle of approved kind, which had always worked satisfactorily, and had been used several times that day. That while proceeding up the Brewerton channel, when about three-quarters of a mile from the turn into the Ft. McHenry channel, the Crathorne was seen coming down the Ft. McHenry channel, on its easternmost side, more than a mile off. That shortly thereafter the pilot of the Acilia, "knowing the custom of pilots going to and coming from the port of Baltimore of giving the laden vessel coming down the easternmost side of the channel, where the water is deeper, and of the lighter laden vessel taking the westernmost side, where the water is shallower, proceeded to change the course of his ship by putting his helm hard a-starboard, and to signal, so as to head for the westernmost side of the channel." That he directed the second officer to blow two short blasts as a signal, but the whistle of the Acilia continued to blow one long drawn out blast, without stop or interruption, which continued five or six minutes, and until after the collision. That, finding that the whistle could not be shut off,

the pilot of the Acilia put her engines full speed astern, and they were kept so for some time before the collision, so that the headway of the Acilia had been entirely overcome at the time of the collision. That the Crathorne, not observing the unusual character of the continued whistle, apparently regarded it as an ordinary passing signal for port helm, and changed her course, and kept on at full speed, and struck the Acilia on her starboard bow, about 27 feet aft the stem, and turned her around nearly at right angles with the channel, putting her bow outside the channel, and striking the Acilia a second time about amidships. That owing to the great speed of the Crathorne, and to the fact that her plating was old and weak, her stem was repulsed, and turned to port. That the whistle of the Acilia could not be stopped until the steam had been shut off at the boiler, after the collision. That subsequently, on being taken apart, it was discovered that two small pieces of metal had apparently been carried up by the steam, and lodged on the valve seat of the whistle, so as to prevent its closing. That it is not known where the small pieces of metal came from, and no practicable care or diligence could have avoided such an accident. That the Acilia was navigated with great caution and skill, and complied with every rule, and the collision was wholly caused by fault on the part of those in charge of the Crathorne, (1) in that they assumed that the prolonged whistle of the Acilia was a passing signal, and so shaped her course; (2) that the sight of the escaping steam from the whistle and the change in the heading of the Acilia was not taken as a warning that it was not a passing signal; (3) in persisting in their mistake when it involved risk of collision; (4) in not regarding the prolonged whistle as a signal of distress, calling for special caution on their part; (5) for running at too great speed in the channel; (6) for failing to stop and reverse promptly; (7) in failing to starboard so as to avoid the Acilia; (8) in failing to sound danger signals. They claim that the damages to the Acilia, including demurrage, amount to $60,000.

The navigation of these two steamships was governed by the act of congress approved June 7, 1897, entitled "An act to adopt regulations for preventing collisions upon certain harbors, rivers, and inland waters of the United States." This act superseded all previous legislation, and all regulations adopted in pursuance of such legislation, and contains the whole law at present in force as to the Chesapeake Bay and its tributaries, except certain amendments to rule 2 and rule 4, adopted by the board of supervising inspectors, and approved by the secretary of the treasury, January 30 and February 1, 1900, which are not material to this case.

The testimony disclosed that the licensed pilot in charge of the navigation of the Acilia was grossly in fault. He was bringing the Acilia, a steamship of 452 feet length, up the Brewerton channel, approaching the bend which unites the Brewerton with the Ft. Henry channel, and was about to pass a descending steamer in the bend, a situation plainly demanding caution, yet he continued the Acilia at her full ocean going speed of not less than 10 knots, and probably more. It is true that the master of the Acilia states that

108 F.—62

he had about 10 minutes before the collision told the chief engineer to reduce steam in the boilers, as they were approaching quarantine, but there is no evidence that this suggestion had been acted upon or had produced any effect. The pilot gave no order at all to the engine room to lessen speed until, when the collision was imminent, he ordered the engines reversed. Full speed in these dredged channels, when about to pass other vessels, is undeniably a fault which increases every risk of navigation. Appleby v. The Kate Irving (D. C.) 2 Fed. 924.

Article 25 of the inland rules, established by the above-mentioned act of June 7, 1897, is as follows: "In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel." This was a dredged channel of about 600 feet width. It was therefore, in the sense of the statute, a narrow channel, and it was perfectly safe and practicable to obey the rule. For some reason of his own, but with no legal excuse, the pilot of the Acilia determined to disobey the rule, and endanger the ship, which, because of his supposed familiarity with the local rules, had been intrusted to him. He states that he supposed the Crathorne, being a laden vessel, would desire the northerly or easterly side of the channel, which is the side marked by buoys; but he had no right to proceed upon such a supposition without an interchange of signals. The testimony shows that there is no reason for such a violation of the rule. The channel is of the same depth on both sides, there is ample room to make the turn, and the pilot of the Crathorne expected nothing but that the rule would be obeyed. And, even after the whistle went wrong, there would seem to have been time enough to have brought the Acilia under a port helm to the northerly or easterly side of the channel, if her pilot had been willing to do so. It is not to be endured that certain of the pilots shall arbitrarily pursue a course in opposition to the law, and what makes it even more dangerous is that there is no agreement even among the pilots of the same association. The Mary Shaw (D. C.) 6 Fed. 918; Steamship Co. v. Smith, 20 C. C. A. 419, 74 Fed. 261–267.

If the Acilia had been steered for her proper side of the channel, as directed by the law, there would have been no collision, notwithstanding her speed and the accident to her whistle. It is not true, as is stated in the libel of the owners of the Acilia, that she was navigated with great caution and skill, and complied with every rule; but the reverse is the fact. It is true that the officers and seamen of the Acilia obeyed and executed with promptness and skill the orders they received from the pilot, but they did not receive proper orders. Belden v. Chase, 150 U. S. 674–699, 14 Sup. Ct. 264, 37 L. Ed. 1218.

It being manifest that the Acilia must be held in fault, it remains to consider whether the pilot in charge of the Crathorne is to be held in fault for the omission to do something that he might have done to avoid the collision. The Crathorne was going at a moderate speed, probably not over six miles an hour. She was, when the

Acilia signaled, a little to the southward of the center of the channel; that is to say, nearest to the side which was to her starboard. What was done on the Crathorne is quite fairly stated by the witness Newton, her first officer, who was the officer put in charge of the bridge to execute the pilot's directions. His testimony, reduced to narrative form, is, in substance, as follows:

"We saw the Acilia two or three miles off. When she was a little below the bend she blew her whistle. She was then two points on our port bow, showing us her starboard side. When she got to the bend we would expect that she would go around into the Fort McHenry channel, which we were coming down, and pass us, port to port. I would say she was five or six ship's lengths off when she first blew her whistle. Our pilot answered with one short blast, and said, 'Port the helm,' and the man put the wheel over, and while he was porting the pilot said, 'Hard a-port.' We then observed that, contrary to her signal and contrary to the rule, instead of porting the Acilia was going off to our starboard side of the channel, and our pilot gave the order, 'Stop and full speed astern,' and I transmitted it by the telegraph to the engine room. We were then two ship's lengths from the Acilia."

He thinks it was about a minute from first hearing the Acilia's whistle to the time when they noticed the Acilia's change of course as if she was under a starboard helm, and it was not until then that he thought there was something wrong with the Acilia. The master of the Crathorne states that he had left the bridge to go to the water-closet, and while there heard his ship give one short blast; that presently he felt the engines going astern, and then he came out, passed through the saloon, and up the port side of the deck, and when he had arrived at the foot of the ladder leading to the bridge the collision occurred. The testimony of the pilot of the Crathorne is to the same effect. He says the Crathorne had just passed buoy 34 when he heard the first of the Acilia's whistle. He says he was expecting a port whistle, because he was intending to keep the starboard side, and never had any other intention, and that he kept ahead under a port helm until he made out that the Acilia was starboarding and heading across his bow, and then he gave the order to stop and reverse. The pilot of the Acilia testifies that he was abeam of buoy No. 30, and about mid-channel, when he ordered the wheel to starboard, and told the second officer to blow two short blasts; that the wheel was put to starboard, and the whistle started, and it continued to blow, and could not be stopped; that when he found the whistle was out of order he gave the order full speed astern, and that the engines were going astern for three minutes before the collision; that when he gave the order to blow the signals the Crathorne was about three-quarters of a mile off, near buoy 34.

The vessels came together just inside the southerly and westerly edge of the channel, quite close to the black buoy which marks the apex of the bend. The bow of the Crathorne struck the bluff of the starboard bow of the Acilia, and rebounded, and struck the Acilia again about midships. The bow of the Crathorne was driven in, and crushed over to port, and the plating of the Acilia was punctured in several places by the Crathorne's anchor, as it scraped along the Acilia's starboard side. The headway of the Crathorne

was stopped by the blow, and the Acilia kept on rubbing by the Crathorne's bow. The Brewerton channel runs W. N. W., and the Ft. McHenry channel N. W. ½ N., so that they make an angle of two and a half points, or about 28°.

This is not the case of two steamships approaching by straight courses. The case is peculiar, in this: That those navigating the Crathorne, looking across the bend of the channel, would see the starboard side of the Acilia, but they would know that in order to keep in the channel when she reached the bend she must port her helm, and her bow must come to starboard, and expose to them her port side, and the fact that they continued to see her starboard side, even until she was nearly up to the black buoy at the apex of the bend, was no sure indication that she did not intend to port. It would only indicate some slowness in making the turn, or that the ship had perhaps taken a sheer which presently her port helm would overcome. As they watched her, they would every moment be expecting to see indications of the change to a port helm. The last thing they would have a right to assume would be that those in charge of the Acilia were persistently determined to take the wrong side of the channel. The continuing of the whistle blowing was only confusing, and without certain meaning. It did not mean that the Acilia was going to disobey the rule, and she was not in distress needing assistance. Article 31. Under these circumstances, it does not seem reasonable that the highest degree of promptness and certainty of action should be exacted of those navigating the Crathorne. They were confronted by a perplexing situation, brought about by no fault of their own. The George L. Garlick (D. C.) 91 Fed. 920-924; The George S. Shultz, 28 C. C. A. 476, 84 Fed. 508. The fault charged against the Crathorne amounts, I think, to this: That when the Acilia's whistle continued to blow for more than three or four seconds the pilot of the Crathorne should have treated it as a distress signal, or a signal which he could not understand, and should have blown danger signals, and at once have slowed his vessel, or stopped and reversed.

Rule 3 provides as follows:

"If when steam vessels are approaching each other either vessel fails to understand the course or intention of the other from any cause the vessel so in doubt shall immediately signify the same by giving several short and rapid blasts, not less than four, of the steam whistle; and, if the vessels shall have approached within half a mile of each other, both shall be immediately slowed to a speed barely sufficient for steerageway until proper signals are given, answered, and understood, or until the vessels shall have passed each other."

Now, the difference, as I understand it, between what it is contended the pilot of the Crathorne should have done and what in fact he did do, is this: It is contended that, as soon as the Acilia's whistle continued to blow beyond the proper duration of a passing signal, the Crathorne should instantly have stopped and reversed, while what he did do was to delay giving that order until he saw that the Acilia was not directing her course up the channel, but was going off to his starboard, and crossing his bow, he having in the meantime hard a-ported his helm, and gone close to his starboard side of the

channel. There was no manifest danger of collision, so far as the pilot of the Crathorne could judge, until he could see that the Acilia's course was directed towards the southerly side of the channel, and this he could not determine with certainty until the Acilia had passed the point where, in order to keep in the channel, she had to port. Until in some way warned to the contrary, the pilot of the Crathorne was entitled to presume that the other pilot would act lawfully, and keep to his proper side of the channel, and that, even if by reason of some sheer of his ship he did not enter on that course as soon as he might, he would do so as soon as he could bring his vessel's head around.

It cannot be said that the pilot of the Crathorne failed to understand the course or intention of the Acilia until he could make out that she was under a starboard helm, because he had a right to presume, until he received a signal of two blasts, that she was going to obey the statute, and keep to her proper side of the channel. Therefore it was not a fault that he did not blow danger signals. He blew one blast, and that was not heard on the bridge of the Acilia, because of the sound of her own whistle. But, even if danger whistles could have been heard, it does not seem possible that they would have afforded any information to those on the Acilia. The pilot of the Acilia says he already knew there was danger when he had starboarded his helm, and found that he could not shut off the Acilia's whistle, and so could not give notice of the altered course he had entered upon.

But the omission to give danger signals, if, indeed, they ought, under the rule, to have been given, is not sufficient to charge the Crathorne with fault, as it clearly appears that the omission in no way contributed to the disaster, as the pilot of the Acilia already knew all that danger signals could have conveyed to him. The City of Washington, 92 U. S. 31-37, 23 L. Ed. 600. To put upon the Crathorne the responsibility for the failure of her pilot to do all that any navigator might possibly have done if he had understood then what is understood now, after the unlooked-for intention of the Acilia's pilot has been explained, and the cause of the prolonged whistle has been discovered, is, as was said by Lord Esher, M. R., in The Stephanotis and The Horton, cited on page 428, 168 U. S., page 157, 18 Sup. Ct., and page 530, 42 L. Ed., in the case of The Victory and The Plymothian, "requiring men to do what no man ought to be expected to do under such circumstances." All the language of Lord Esher quoted in the decision above cited seems to me quite applicable to the present case. What the pilot of the Crathorne did was to port as soon as he heard the Acilia's whistle, and to give a signal of one blast, and when the Acilia's whistle continued he hard a-ported, which took his vessel more and more towards his own side of the channel, and gave more room for the use of the Acilia; and when he could be sure that the Acilia was not going to follow the channel, but under a hard starboard helm was heading him off, he stopped and reversed.

Suppose when he first discovered that there was something, he could not tell what, wrong with the Acilia's whistle, he had then either stopped and reversed, or starboarded his helm, and the Acilia

had then obeyed the law, and ported, and a collision ensued, would not the Aeilia's proctor be justified in urging: "You should never have presumed that we were going to act unlawfully. We never gave you two blasts, and why should you infer that we did not mean to keep to our side of the channel? If you had obeyed the rule, and ported, and kept on instead of stopping merely because our whistle was out of order, there would have been no collision." In The Thingvalla, 1 C. C. A. 87, 48 Fed. 764–768, this reasoning was applied, and a vessel held not in fault for not changing her course as soon as she saw a mistaken maneuver of the approaching vessel, as the first vessel could not know but that the approaching vessel would change and conform to the rule. In The Delaware, 161 U. S. 459–469, 16 Sup. Ct. 516–521, 40 L. Ed. 771–775, the supreme court, speaking of a situation somewhat similar to that in the present case, said, "Until the last moment the tug had a right to assume that she [the Delaware] would comply with the rule," and the court held that there was too much doubt about the fault of the tug to justify an apportionment of the damages. The Victory and The Plymothian, 168 U. S. 410, 18 Sup. Ct. 149, 42 L. Ed. 519, was a case of collision between two steamships in a narrow channel, in which the Victory was held in fault for being on the wrong side of the channel; and, her fault being obvious and inexcusable, it was held (page 423, 168 U. S., page 155, 18 Sup. Ct., and page 528, 42 L. Ed.) that "evidence to establish fault on the part of the Plymothian should be clear and convincing in order to make a case for apportionment," and that any doubts regarding her management were to be resolved in her favor. The supreme court held (page 424, 168 U. S., page 155, 18 Sup. Ct., and page 529, 42 L. Ed.) that the Plymothian was not bound to stop and reverse earlier, as she had a right to presume that the Victory would act lawfully, and would keep to her own side, and, if temporarily crowded out of her course, would return to it as soon as possible. In the recent case of The Albert Dumois, 177 U. S. 240, 20 Sup. Ct. 595, 44 L. Ed. 751, the supreme court again declared that exceptions to general rules of navigation are to be admitted with reluctance, and only when adherence to the rule must almost necessarily result in collision. They held that the Albert Dumois was primarily in fault for trying to pass the Argo starboard to starboard, in disregard of the rule. The Argo was going down the Mississippi river below New Orleans at the unusual speed of 20 miles an hour, with the added movement of the current. The proof established that she disregarded two signals, of two blasts each, from the Albert Dumois, which was proceeding up the river slowly, against the current, and which were given in reply to her own signal of one blast, and the court held that she was in fault in failing to stop and reverse when it was plain, from the Dumois shutting in her red light and exhibiting her green, and from her signals, that she was starboarding. The court found that the Dumois must have starboarded, and shown her green light, some time before the Argo ported, and that the Dumois must have run a quarter of a mile across the river, showing her green light, to reach the point of collision. Even with these strong circumstances showing fault on the part of the Argo in not regarding the rule with

regard to cross signals, and not acting promptly in the face of a manifestly wrong maneuver by the Dumois, two of the justices dissented, such is the reluctance to condemn the pilot who has used his best judgment in the face of a danger brought about by the violation of a plain rule of navigation by the other vessel.

There is some conflict in the testimony in the present case as to the distance apart of the two vessels when the signals were given and when the engines of each were reversed. The witnesses from the Crathorne estimate the distance at the beginning of the whistle at 5 or 6 ship's lengths apart; the witnesses from the Acilia place the vessels, the one at near buoy 30, and the other at near buoy 34, when the Acilia began to blow her whistle, and this would be a distance of about three-quarters of a mile. I think probably both are somewhat mistaken. The Acilia was probably, as her witnesses state, near buoy 30 when she signaled, but the Crathorne was probably somewhat further down the channel, and nearer to buoy 32, as her own witnesses testify; but I am satisfied they were not less than half a mile from each other when the Acilia began to blow. Their combined speed was over 15 miles an hour, so that, if that speed continued, they would require less than two minutes to come together, starting from the distance of half a mile apart. The evidence establishes that the speed of the Acilia was greater than that of the Crathorne, both before and at the time of the collision. The character of the damage tends to confirm this. The bow of the Crathorne, although she was heavily laden with cargo, and drew over 21 feet, was smashed in bodily, and her headway was stopped by the blow, while the Acilia was not cut into except by the Crathorne's anchor, as it slipped along the Acilia's starboard side. If the Crathorne's speed had been greater, it would have resulted, I am inclined to think, in her bow penetrating into the Acilia's hull. The signal of one whistle, given by the Crathorne, was not heard on the bridge of the Acilia, because of the continuous sounding of their own whistle, but men on other vessels in the neighborhood heard it, and possibly it may have been heard on the bow of the Acilia by the lookout, but he was not examined. I hold that the Acilia is solely responsible for the collision.

I cannot pronounce this decree without adding some observations with regard to some of the licensed pilots of the Chesapeake Bay. If I am right in my decision of this case, owners of the German steamship Acilia have suffered a loss, which it is said may amount to $100,000, by the inexcusable violation of a rule of navigation by one of our own pilots, employed because he is supposed to know the local rules, and whose services they were compelled to accept. Notwithstanding the accident to the steamship's whistle, this loss could not have happened, in broad daylight, and with all natural conditions favorable for safety, if the pilot of the Acilia had not willfully disobeyed the rule prescribed by act of congress for navigating narrow channels. I have been for a long time disturbed by observing how little attention is paid by many of these members of the pilot association to the regulations prescribed by congress, and by the United States supervising inspectors under authority of congress, for pre-

venting collisions. They seem often to be arbitrary and opinionated in their notions of navigation, and indifferent to the fact that it is the owners of these large and valuable steamships, and not them-selves, who have to pay for their neglects. They receive a compensation in excess of that paid to highly intelligent men of ability who are masters of steamers, and it is but fair to expect of them an equal degree of intelligence and character, and yet the truth is that admiralty lawyers often feel great concern at being obliged to put some of these pilots on the witness stand. They frequently give such an unintelligent, obviously incorrect, and biased explanation of the cause of their collisions, and the way the ships came together, and of their own maneuvers, that they put in jeopardy even a good case. I am not infrequently obliged, in order to get at the real facts, to refuse to accept what they testify to. It has more than once happened that when testifying the witness has been noticeably affected by drink, thus exhibiting a lamentable lack of any sense of responsibility for their conduct as pilots. I do not wish to be considered as speaking of all, for it is probable that it is only those who have got ships into collision that I have seen in court, and I do not doubt that there are many who are justly entitled to high reputation; but, speaking of some of those I have heard testify, I feel it my duty, in a matter of such great interest to the commerce of the port, to say that these men do not exhibit the knowledge of the rules of navigation, the education, the intelligence, and the character that is fairly to be expected of men who occupy the position which special legislation has given to these pilots. In my judgment, there should be a more rigid supervision of the members of this body, with a view to requiring of its members character, intelligence, temperance, and obedience to the rules of navigation, and of punishing derelictions by suspension and dismissal.